PHILLIPS ET AL. *v.* WASHINGTON LEGAL
FOUNDATION ET AL.

No. 96–1578.   Argued January 13, 1998—Decided June 15, 1998

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 172. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post*, p. 179.

*Darrell E. Jordan* argued the cause for petitioners. With him on the briefs were *Brittan L. Buchanan, David J. Schenck,* and *Nancy Trease.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging reversal. With him on the briefs were *Acting Solicitor General Dellinger, Assistant Attorneys General Hunger* and *Schiffer, Patricia A. Millett, Robert Klarquist,* and *Timothy Dowling.*

*Richard A. Samp* argued the cause for respondents. With him on the brief were *Daniel J. Popeo, Donald B. Ayer, Thomas M. Fisher,* and *Michael J. Mazzone.**

---

*Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Massachusetts et al. by *Scott Harshbarger,* Attorney General of Massachusetts, and *Deborah Steenland,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *Thomas J. Miller* of Iowa, *Albert B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *John Knox Walkup* of Tennessee, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, and *William U. Hill* of Wyoming; for the American Association of Retired Persons et al. by *John H. Pickering, Bruce Vignery, Michael R. Schuster,* and *J. Allen May;* for the American Bar Association by *Jerome J. Shestack, Jerold S. Solovy, Barry Levenstam, Paul M. Smith,* and *Nory Miller;* for the

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Texas, like 48 other States and the District of Columbia,[1] has adopted an Interest on Lawyers Trust Account

Columbus Bar Association et al. by *Richard A. Cordray* and *Richard A. Frye;* for the Conference of Chief Justices by *Brian J. Serr* and *Charles Alan Wright;* for the Council of State Governments et al. by *Richard Ruda, David B. Isbell, Robert A. Long, Jr.,* and *Caroline M. Brown;* for the Massachusetts Bar Foundation by *Henry C. Dinger;* and for the Texas Equal Access to Justice Program et al. by *Peter M. Siegel, Randall C. Berg, Jr., JoNel Newman,* and *Arthur J. England, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the Association for Objective Law by *Stephen Plafker;* for the Attorneys' Bar Association of Florida by *Ronald D. Maines* and *Harvey M. Alper;* for Defenders of Property Rights et al. by *Nancie G. Marzulla;* for the National Right to Work Legal Defense Foundation, Inc., by *John C. Scully;* for the Pacific Legal Foundation by *James S. Burling, R. S. Radford,* and *Stephen E. Abraham;* for the Mountain States Legal Foundation by *William Perry Pendley;* for the Texas Justice Foundation by *David L. Wilkinson* and *Allan E. Parker, Jr.;* and for Robert E. Talton et al. by *Stephen R. McAllister* and *Mark W. Smith.*

[1] Ala. Rule Prof. Conduct 1.15(g) (1996); Alaska Rule Prof. Conduct 1.15(d) (1997); Ariz. Sup. Ct. Rule 44(c)(2) (1997); Ark. Rule Prof. Conduct 1.15(d)(2) (1997); Cal. Bus. & Prof. Code Ann. § 6211(a) (West 1990 and Supp. 1998); Colo. Rule Prof. Conduct 1.15(e)(2) (1997); Conn. Rule Prof. Conduct 1.15(d) (1998); Del. Rule Prof. Conduct 1.15(h) (1998); D. C. Rule Prof. Conduct 1.15(e) (1997); Fla. Bar Rule 5–1.1 (1994 and Supp. 1998); Ga. Code Prof. Responsibility Rule 3–109, DR 9–102 (1998); Haw. Sup. Ct. Rule 11 (1997); Idaho Rule Prof. Conduct 1.15(d) (1997); Ill. Rule Prof. Conduct 1.15(d) (1997); Iowa Code Prof. Responsibility DR 9–102 (1997); Kan. Rule Prof. Conduct 1.15(d)(3) (1997); Ky. Sup. Ct. Rule 3.830 (1998); La. Rule Prof. Conduct 1.15(d) (1997); Me. Code Prof. Responsibility 3.6(e)(4) (1997); Md. Bus. Occ. & Prof. Code Ann. § 10–303 (1995); Mass. Sup. Ct. Rule 3:07, DR 9–102 (1997); Mich. Rule Prof. Conduct 1.15(d) (1997); Minn. Rule Prof. Conduct 1.15(d) (1993); Miss. Rule Prof. Conduct 1.15(d) (1997); Mo. Rule Prof. Conduct 1.15(d) (1997); Mont. Rule Prof. Conduct 1.18(b) (1996); Neb. Sup. Ct. Trust Acct. Rules 1–8 (1997); Nev. Sup. Ct. Rule 217 (1998); *Petition of New Hampshire Bar Assn.*, 122 N. H. 971, 453 A. 2d 1258 (1982); N. J. Rules Gen. Application 1:28A–2 (1998); N. M. Rule Prof. Conduct 16–115(D) (1998); N. Y. Jud. Law § 497 (McKinney Supp. 1997 and 1998); N. C. Rule Prof. Conduct 1.15–3 (1997); N. D. Rule

(IOLTA) program. Under these programs, certain client funds held by an attorney in connection with his practice of law are deposited in bank accounts. The interest income generated by the funds is paid to foundations that finance legal services for low-income individuals. The question presented by this case is whether interest earned on client funds held in IOLTA accounts is "private property" of either the client or the attorney for purposes of the Takings Clause of the Fifth Amendment. We hold that it is the property of the client.

I

In the course of their legal practice, attorneys are frequently required to hold client funds for various lengths of time. Before 1980, an attorney generally held such funds in noninterest-bearing, federally insured checking accounts in which all client trust funds of an individual attorney were pooled. These accounts provided administrative convenience and ready access to funds. They were noninterest bearing because federal law prohibited federally insured banks and savings and loans from paying interest on checking accounts. See 12 U. S. C. §§ 371a, 1464(b)(1)(B), 1828(g). When a lawyer held a large sum in trust for his client, such funds were generally placed in an interest-bearing savings account because the interest generated

Prof. Conduct 1.15(d)(1) (1997); Ohio Rev. Code Ann. § 4705.09(A)(1) (1997); Okla. Rule Prof. Conduct 1.15(d) (1997); Ore. Code Prof. Responsibility DR 9–101(D)(2) (1997); Pa. Rule Prof. Conduct 1.15(d) (1997) and Pa. Rule Disciplinary Enforcement 601(d) (1997); R. I. Rule Prof. Conduct 1.15(d) (1997); S. C. App. Ct. Rule 412 (1988); S. D. Rule Prof. Conduct 1.15(d)(4) (1995); Tenn. Code Prof. Responsibility DR 9–102(C)(2) (1997); *In re Interest on Lawyers' Trust Accounts*, 672 P. 2d 406 (Utah 1983); Va. Sup. Ct. Rules, Pt. 6, § 4, ¶ 20 (1997); Vt. Code Prof. Responsibility DR 9–103 (1996); Wash. Rule Prof. Conduct 1.14(c)(1) (1997); W. Va. Rule Prof. Conduct 1.15(d) (1997); Wis. Sup. Ct. Rules 13.04, 20:1.15 (1997); Wyo. Rule Prof. Conduct 1.15(II) (1997). Indiana is the only State that has not implemented an IOLTA program. See *In re Indiana State Bar Assn. Petition*, 550 N. E. 2d 311 (Ind. 1990).

outweighed the inconvenience caused by the lack of check-writing capabilities.

In 1980, Congress authorized the creation of Negotiable Order of Withdrawal (NOW) accounts, which for the first time permitted federally insured banks to pay interest on demand deposits. § 303, 94 Stat. 146, as amended, 12 U. S. C. § 1832. NOW accounts are permitted only for deposits that "consist solely of funds in which the entire beneficial interest is held by one or more individuals or by an organization which is operated primarily for religious, philanthropic, charitable, educational, political, or other similar purposes and which is not operated for profit." § 1832(a)(2). For-profit corporations and partnerships are thus prohibited from earning interest on demand deposits. See *ibid.* However, interpreting § 1832(a), the Federal Reserve Board has concluded that corporate funds may be held in NOW accounts if the funds are held in trust pursuant to a program under which charitable organizations have "the exclusive right to the interest." Letter from Federal Reserve Board General Counsel Michael Bradfield to Donald Middlebrooks (Oct. 15, 1981), reprinted in Middlebrooks, The Interest on Trust Accounts Program: Mechanics of its Operation, 56 Fla. B. J. 115, 117 (Feb. 1982) (hereinafter Federal Reserve's IOLTA Letter).[2]

Beginning with Florida in 1981, a number of States moved quickly to capitalize on this change in the banking regulations by establishing IOLTA programs. Texas followed suit in 1984. Its Supreme Court issued an order, now codified as Article XI of the State Bar Rules, providing that an attorney who receives client funds that are "nominal in amount or are reasonably anticipated to be held for a short period of time" must place such funds in a separate, interest-bearing NOW account (an IOLTA account). Tex. State Bar Rule, Art. XI,

---

[2] We express no opinion as to the reasonableness of this interpretation of § 1832(a). See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 844 (1984).

§ 5(A); Rules 4, 7 of the Texas Rules Governing the Operation of the Texas Equal Access to Justice Program. Client funds are considered "nominal in amount" or "held for a short period of time" if the attorney holding the funds determines that

> "such funds, considered without regard to funds of other clients which may be held by the attorney, law firm or professional corporation, could not reasonably be expected to earn interest for the client or if the interest which might be earned on such funds is not likely to be sufficient to offset the cost of establishing and maintaining the account, service charges, accounting costs and tax reporting costs which would be incurred in attempting to obtain the interest on such funds for the client." Texas IOLTA Rule 6.

Interest earned by the funds deposited in an IOLTA account is to be paid to the Texas Equal Access to Justice Foundation (TEAJF), a nonprofit corporation established by the Supreme Court of Texas. Tex. State Bar Rule, Art. XI, §§ 3, 4; Texas IOLTA Rule 9(a). TEAJF distributes the funds to nonprofit organizations that "have as a primary purpose the delivery of legal services to low income persons." Texas IOLTA Rule 10. The Internal Revenue Service does not attribute the interest generated by an IOLTA account to the individual clients for federal income tax purposes so long as the client has no control over the decision whether to place the funds in the IOLTA account and does not designate who will receive the interest generated by the account. See Rev. Rul. 81–209, 1981–2 Cum. Bull. 16; Rev. Rul. 87–2, 1987–1 Cum. Bull. 18.

Respondents are the Washington Legal Foundation (WLF), Michael Mazzone, and William Summers. WLF is a public-interest law and policy center with members in the State of Texas who are opposed to the Texas IOLTA program. App. 26. Mazzone is an attorney admitted to practice in

Texas who maintains an IOLTA account into which he regularly deposits client funds. *Id.*, at 82. Summers is a Texas citizen and businessman whose work requires him to make regular use of the services of an attorney. In January 1994, Summers learned that a retainer he had deposited with his attorney was being held in an IOLTA account. *Id.*, at 85. In February 1994, respondents filed this suit against petitioners—TEAJF, W. Frank Newton, in his official capacity as chairman of TEAJF, and the nine Justices of the Supreme Court of Texas. Respondents alleged, *inter alia*, that the Texas IOLTA program violated their rights under the Fifth Amendment, by taking their property without just compensation.

The District Court granted summary judgment to petitioners, reasoning that respondents had no property interest in the interest proceeds generated by the funds held in IOLTA accounts. *Washington Legal Foundation* v. *Texas Equal Access to Justice Foundation*, 873 F. Supp. 1 (WD Tex. 1995). The Court of Appeals for the Fifth Circuit reversed, concluding that "any interest that accrues belongs to the owner of the principal." *Washington Legal Foundation* v. *Texas Equal Access to Justice Foundation*, 94 F. 3d 996, 1004 (1996). Because of a split over whether the interest income generated by funds held in IOLTA accounts is private property for purposes of the Fifth Amendment's Takings Clause,[3] we granted certiorari. 521 U. S. 1117 (1997).

## II

The Fifth Amendment, made applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q. R. Co.*

---

[3] *Cone* v. *State Bar of Fla.*, 819 F. 2d 1002 (CA11), cert. denied, 484 U. S. 917 (1987); *In re Interest on Lawyers' Trust Accounts*, 672 P. 2d 406 (Utah 1983); *Petition of New Hampshire Bar Assn.*, 122 N. H., at 975–976, 453 A. 2d, at 1260–1261; *In re Minnesota State Bar Assn.*, 332 N. W. 2d 151, 158 (Minn. 1982); *In re Interest on Trust Accounts*, 402 So. 2d 389, 395–396 (Fla. 1981).

v. *Chicago,* 166 U. S. 226, 239 (1897), provides that "private property" shall not "be taken for public use, without just compensation." Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to "existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 577 (1972).

All agree that under Texas law the principal held in IOLTA trust accounts is the "private property" of the client. Texas IOLTA Rule 4 (discussing circumstances under which "client funds" must be deposited in an IOLTA account); Texas Bar Rule 1.14(a) (lawyers "shall hold funds . . . belonging in whole or in part to clients . . . separate from the lawyer's own property"); see also Brief for United States as *Amicus Curiae* 10 ("There can be no doubt that the client funds underlying the IOLTA program are the property of respondents"). When deposited in an IOLTA account, these funds remain in the control of a private attorney and are freely available to the client upon demand. As to the principal, then, the IOLTA rules at most "regulate the use of [the] property." *Yee* v. *Escondido,* 503 U. S. 519, 522 (1992). Respondents do not contend that the State's regulation of the manner in which attorneys hold and manage client funds amounts to a taking of private property. The question in this case is whether the interest on an IOLTA account is "private property" of the client for whom the principal is being held.[4]

---

[4] We granted certiorari in this case to answer the question whether "interest earned on client trust funds held by lawyers in IOLTA accounts [is] a property interest of the client or lawyer, cognizable under the . . . Fifth Amendmen[t] to the U. S. Constitution . . . ." Pet. for Cert. i. JUSTICE SOUTER contends that we should vacate the judgment of the Court of Appeals because it was improper for that court to have answered this question apart from the takings and just compensation questions. Petitioners, however, did not argue in their petition for certiorari that it was error for the Fifth Circuit to address the property question alone. Because, under this Court's Rule 14(1)(a), our practice is to consider "[o]nly

The rule that "interest follows principal" has been established under English common law since at least the mid-1700's. *Beckford* v. *Tobin*, 1 Ves. Sen. 308, 310, 27 Eng. Rep. 1049, 1051 (Ch. 1749) ("[I]nterest shall follow the principal, as the shadow the body"). Not surprisingly, this rule has become firmly embedded in the common law of the various States.[5] The Court of Appeals in this case, two of the three

the questions set forth in the petition, or fairly included therein," it would be improper for us *sua sponte* to raise and address the question answered by JUSTICE SOUTER.

[5] *E. g.*, *Freeman* v. *Young*, 507 So. 2d 109, 110 (Ala. Civ. App. 1987) ("The earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property" (internal quotation marks omitted)); *Pomona City School Dist.* v. *Payne*, 9 Cal. App. 2d 510, 512, 50 P. 2d 822, 823 (1935) ("[O]bviously the interest accretions belong to such owner"); *Vidal Realtors of Westport, Inc.* v. *Harry Bennett & Assocs., Inc.*, 1 Conn. App. 291, 297–298, 471 A. 2d 658, 662 (1984) ("As long as the attached fund is used for profit, the profit . . . is impounded for the benefit of the attaching creditor and is subject to the same ultimate disposition as the principal of which it is the incident" (internal quotation marks omitted)); *Burnett* v. *Brito*, 478 So. 2d 845, 849 (Fla. App. 1985) ("[A]ny interest earned on interpleaded and deposited funds follows the principal and shall be allocated to whomever is found entitled to the principal"); *Morton Grove Park Dist.* v. *American Nat. Bank & Trust Co.*, 78 Ill. 2d 353, 362–363, 399 N. E. 2d 1295, 1299 (1980) ("The earnings on the funds deposited are a mere incident of ownership of the fund itself"); *B & M Coal Corp.* v. *United Mine Workers*, 501 N. E. 2d 401, 405 (Ind. 1986) ("[I]nterest earnings must follow the principal and be distributed to the ultimate owners of the fund"); *Unified School Dist. No. 490, Butler County* v. *Board of County Commissioners of Butler County*, 237 Kan. 6, 9, 697 P. 2d 64, 69 (1985) ("[I]nterest follows principal"); *Pontiac School Dist.* v. *City of Pontiac*, 294 Mich. 708, 715–716, 294 N. W. 141, 144 (1940) ("The generally understood and applied principles that interest is merely an incident of the principal and must be accounted for"); *State Highway Comm'n* v. *Spainhower*, 504 S. W. 2d 121, 126 (Mo. 1973) ("Interest earned by a deposit of special funds is an increment accruing thereto" (internal quotation marks omitted)); *Siroky* v. *Richland County*, 271 Mont. 67, 74, 894 P. 2d 309, 313 (1995) ("[I]nterest earned belongs to the owner of the funds that generated the interest"); *Bordy* v. *Smith*, 150 Neb. 272, 276, 34 N. W. 2d 331, 334 (1948) ("Once settled clearly and definitely whose money the principal sum was, the interest necessarily belongs to that person as an increment to the principal fund"); *State ex rel. Board of County Com-*

judges of which are Texans, held that Texas also follows this rule, citing *Sellers* v. *Harris County*, 483 S. W. 2d 242, 243 (Tex. 1972) ("The interest earned by deposit of money owned by the parties to the lawsuit is an increment that accrues to that money and to its owners"). Indeed, in *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 162 (1980), we cited the *Sellers* opinion as demonstrative of the general rule that "any interest . . . follows the principal."

In *Webb's*, we addressed a Florida statute providing that interest accruing on an interpleader fund deposited in the registry of the court "'shall be deemed income of the office of the clerk of the circuit court.'" *Id.*, at 156, n. 1 (quoting Fla. Stat. § 28.33 (1977)) (emphasis deleted). The appellant in that case filed an interpleader action in Florida state court and tendered the sum at issue, nearly $2 million, into court. In addition to deducting $9,228.74 from the interpleader fund as a fee "for services rendered," the clerk of court also retained the more than $100,000 in interest income generated

---

*missioners* v. *Montoya*, 91 N. M. 421, 423, 575 P. 2d 605, 607 (1978) ("[T]he general rule is that interest is an accretion or increment to the principal fund earning it"); *Stuarco, Inc.* v. *Slafbro Realty Corp.*, 30 App. Div. 2d 80, 82, 289 N. Y. S. 2d 883, 885 (1968) (plaintiff "is entitled to the interest actually accrued . . . despite the absence of any agreement to pay interest on the deposit, and this precisely and only because interest was in fact earned thereon"); *McMillan* v. *Robeson County*, 262 N. C. 413, 417, 137 S. E. 2d 105, 108 (1964) ("The earnings on the fund are a mere incident of ownership of the fund itself"); *Des Moines Mut. Hail & Cyclone Ins. Assn.* v. *Steen*, 43 N. D. 298, 301, 175 N. W. 195 (1919) ("[A]ccruing interest follows the principal"); *Board of Educ., Woodward Pub. Schools* v. *Hensely*, 665 P. 2d 327, 331 (Okla. App. 1983) ("The interest earned . . . becomes a part of the principal of the fund which generates it"); *University of S. C.* v. *Elliott*, 248 S. C. 218, 220, 149 S. E. 2d 433, 434 (1966) ("[I]nterest earned . . . is simply an increment of the principal fund, making the interest the property of the party who owned the principal fund"); *Board of County Commissioners of the County of Laramie* v. *Laramie County School Dist. No. One*, 884 P. 2d 946, 953 (Wyo. 1994) ("In general, interest is merely an incident of the principal fund, making it the property of the party owning the principal fund").

by the deposited funds. We held that the statute authorizing the clerk to confiscate the earned interest violated the Takings Clause. As we explained, "a State, by *ipse dixit*, may not transform private property into public property without compensation" simply by legislatively abrogating the traditional rule that "earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property." 449 U. S., at 164. In other words, at least as to confiscatory regulations (as opposed to those regulating the use of property), a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law. See *id.*, at 163–164; see also *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1029 (1992).

Petitioners nevertheless contend that *Webb's* does not control because Texas does not, in fact, adhere to the "interest follows principal" rule, "at least if elevated to the level of an absolute legal rule." Brief for Petitioners 22. They point to several examples, such as income-only trusts and marital community property rules, where under Texas law interest does not follow principal. According to petitioners, the IOLTA program is simply another exception to the general rule.

We find these examples insufficient to dispel the presumption of deference given the views of a federal court as to the law of a State within its jurisdiction. *Bernhardt* v. *Polygraphic Co. of America*, 350 U. S. 198, 204 (1956). Petitioners' examples miss the point of our decision in *Webb's*. Texas' exception of income-only trusts and certain marital property from the general rule that "interest follows principal" has a firm basis in traditional property law principles. Permitting the owner of a sum of money to distribute to a designated beneficiary the interest income generated by his principal is entirely consistent with the fundamental maxim of property law that the owner of a property interest may dispose of all or part of that interest as he sees fit. *United*

*States* v. *General Motors Corp.*, 323 U. S. 373, 377–378 (1945) (property "denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to . . . dispose of it"). Similarly, the Texas rules governing the distribution of marital assets have a historical pedigree tracing back to the marital property laws adopted by the Texas Congress only four years after Texas became an independent republic. W. McClanahan, Community Property Law in the United States § 3:23, pp. 123–124 (1982). But petitioners point to no "background principles" of property law, *Lucas, supra,* at 1030, that would lead one to the conclusion that the owner of a fund temporarily deposited in an attorney trust account may be deprived of the interest the fund generates.

Petitioners further contend that "interest follows principal" is an incomplete explication of the Texas rule. Reply Brief for Petitioners 11. Petitioners explain that interest follows principal in Texas only if the interest is "allowed by law or fixed by the parties." *Cavnar* v. *Quality Control Parking, Inc.,* 696 S. W. 2d 549, 552 (Tex. 1985). We fail to see how this assists petitioners' cause. We agree that the government has great latitude in regulating the circumstances under which interest may be earned. As we explained in *Andrus* v. *Allard,* 444 U. S. 51, 66 (1979), "anticipated gains ha[ve] traditionally been viewed as less compelling than other property-related interests." But petitioners do not argue that the payment of interest on client funds deposited in an attorney trust account is not "allowed by law" in Texas. Rather, they argue that interest actually "earned" by funds held in IOLTA accounts, Texas IOLTA Rule 9, is not the private property of the owner of the principal. However, regardless of whether the owner of the principal has a constitutionally cognizable interest in the *anticipated* generation of interest by his funds, any interest that *does* accrue attaches as a property right incident to the ownership of the underlying principal.

Finally, petitioners argue that the interest income transferred to the TEAJF is not "private property" because the client funds held in IOLTA accounts "cannot reasonably be expected to generate interest income on their own." Brief for Petitioners 18. As an initial matter, petitioners' assertion that client funds held in IOLTA accounts cannot be expected to generate interest income is plainly incorrect under the express terms of the Texas IOLTA rules. Texas IOLTA Rule 6 requires that client funds held by an attorney be deposited in an IOLTA account "if the interest which might be earned" is insufficient to offset the "cost of establishing and maintaining the account, service charges, accounting costs and tax reporting costs which would be incurred in attempting to obtain the interest on such funds for the client." In other words, it is not that the client funds to be placed in IOLTA accounts cannot generate *interest*, but that they cannot generate *net interest.*

Whether client funds held in IOLTA accounts could generate net interest is a matter of some dispute. As written, the Texas IOLTA program requires the calculation as to net interest to be made "without regard to funds of other clients which may be held by the attorney." Texas IOLTA Rule 6. This provision would deny to an attorney the traditional practice of pooling funds of several clients in one account, a practice which might produce net interest when opening an account for each client would not. But in the District Court, petitioners agreed that this portion of the rule was not to be enforced, and that an attorney could make the necessary calculation on the basis of pooled accounts. Petitioners made a similar concession during oral argument here. Tr. of Oral Arg. 13–16. We accept this concession but find that it does not avail petitioners.

We have never held that a physical item is not "property" simply because it lacks a positive economic or market value. For example, in *Loretto* v. *Teleprompter Manhattan CATV*

*Corp.*, 458 U. S. 419 (1982), we held that a property right was taken even when infringement of that right arguably *increased* the market value of the property at issue. *Id.*, at 437, n. 15. Our conclusion in this regard was premised on our longstanding recognition that property is more than economic value, see *id.*, at 435; it also consists of "the group of rights which the so-called owner exercises in his dominion of the physical thing," such "as the right to possess, use and dispose of it," *General Motors, supra*, at 380. While the interest income at issue here may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in the property. See *Hodel* v. *Irving*, 481 U. S. 704, 715 (1987) (noting that "the right to pass on" property "is itself a valuable right"). The government may not seize rents received by the owner of a building simply because it can prove that the costs incurred in collecting the rents exceed the amount collected.

The United States, as *amicus curiae*, additionally argues that "private property" is not implicated by the IOLTA program because the interest income generated by funds held in IOLTA accounts is "government-created value." Brief for United States as *Amicus Curiae* 20. We disagree. As an initial matter, this argument is factually erroneous. The interest income transferred to the TEAJF is not the product of increased efficiency, economies of scale, or pooling of funds by the government. Indeed, as noted above, the State has conceded at oral argument that if an attorney could in any way (such as pooling of client funds) earn interest for a client, he is ethically obligated to do so rather than place the funds in an IOLTA account. Interest income is economically realizable by IOLTA primarily because: (1) the Federal Government imposes tax reporting costs only on those who attempt to exercise control over the interest their funds generate, see Rev. Rul. 81–209, 1981–2 Cum. Bull. 16; Rev. Rul. 87–2,

1987–1 Cum. Bull. 18; and (2) the Federal Government prohibits for-profit corporations from holding funds in NOW accounts if the interest is paid to the corporation, but permits corporate funds to be held in NOW accounts if the interest is paid to the TEAJF, see Federal Reserve's IOLTA Letter. In other words, the State does nothing to create value; the value is created by respondents' funds. The Federal Government, through the structuring of its banking and taxation regulations, imposes costs on this value if private citizens attempt to exercise control over it. Waiver of these costs if the property is remitted to the State hardly constitutes "government-created value."

In any event, we rejected a similar "government-created value" argument in *Webb's*. There, the State of Florida argued that since the clerk's authority to invest deposited funds was a statutorily created right, any interest income generated by the funds was not private property. 449 U. S., at 163. We rejected this argument, explaining that "the State's having mandated the accrual of interest does not mean the State or its designate is entitled to assume ownership of the interest." *Id.*, at 162.

This would be a different case if the interest income generated by IOLTA accounts was transferred to the State as payment "for services rendered" by the State. *Id.*, at 157. Our holding does not prohibit a State from imposing reasonable fees it incurs in generating and allocating interest income. See *id.*, at 162; cf. *United States* v. *Sperry Corp.*, 493 U. S. 52, 60 (1989) (upholding the imposition of a "reasonable 'user fee'" on those utilizing the Iran-United States Claims Tribunal). But here the State does not, indeed cannot, argue that its confiscation of respondents' interest income amounts to a fee for services performed. Unlike in *Webb's*, where the State safeguarded and invested the deposited funds, funds held in IOLTA accounts are managed entirely by banks and private attorneys.

## III

In sum, we hold that the interest income generated by funds held in IOLTA accounts is the "private property" of the owner of the principal. We express no view as to whether these funds have been "taken" by the State; nor do we express an opinion as to the amount of "just compensation," if any, due respondents. We leave these issues to be addressed on remand. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The Court holds that "interest income generated by funds held in IOLTA accounts is the 'private property' of the owner of the principal." *Ante* this page. I do not join in today's ruling because the Court's limited enquiry has led it to announce an essentially abstract proposition; even assuming that the proposition correctly states the law, it may ultimately turn out to have no significance in resolving the real issue raised in this case, which is whether the Interest on Lawyers Trust Account (IOLTA) scheme violates the Takings Clause of the Fifth Amendment. Since the sounder course would be to vacate the similarly limited judgment of the Court of Appeals for the Fifth Circuit and remand for the broader enquiry outlined below, I respectfully dissent.

The Court recognizes three distinct issues implicated by a takings claim: whether the interest asserted by the plaintiff is property, whether the government has taken that property, and whether the plaintiff has been denied just compensation for the taking. *Ibid.* The Court is careful to address only the first of these questions, *ibid.*, which is the only one on which the Fifth Circuit ruled. See *Washington Legal Foundation* v. *Texas Equal Access to Justice Foundation*, 94 F. 3d 996, 1004 (1996).

The affirmative answer given by the Court and the Fifth Circuit to the question whether IOLTA interest attributable to a client's funds is the client's property states, in essence, a proposition of state law, which is one source of property interests entitled to federal constitutional protection, see *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 577 (1972), and *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1030 (1992). In this instance the relevant state law is said to embrace the general principle that property in interest income follows ownership of the principal on which the interest is earned, *ante*, at 164–166, and n. 4, and the Court treats any income generated by a client's funds like income that the client could derive directly through a method of money management or investment that costs more than it produced, *ante*, at 169–171.

In addressing only the issue of the property interest, leaving the questions of taking and compensation for a later day in the litigation of respondents' action, the Court and the Court of Appeals have, however, postponed consideration of the most salient fact relied upon by petitioners in contesting respondents' Fifth Amendment claim: that the respondent client would effectively be barred from receiving any net interest on his funds subject to the state IOLTA rule by the combination of an unchallenged federal banking statute and regulation, 12 U. S. C. § 1832(a); 12 CFR § 204.130 (1997); a separate, unchallenged Texas rule of attorney discipline, Texas Bar Rules, Art. 10, § 9, Rule 1.14(b); and unchallenged Internal Revenue Service interpretations of the Tax Code, Rev. Rul. 81–209, 1981–2 Cum. Bull. 16; Rev. Rul. 87–2, 1987–1 Cum. Bull. 18. The argument for the view contrary to the one taken by the Court would emphasize that salient fact right now. The view that the client has no cognizable property right in the IOLTA interest is said to rest not only on a different understanding of the scope of the general prin-

ciple and its place in state law,[1] but also upon the very regulatory framework that would prevent a client from obtaining any net interest on funds now subject to IOLTA, even if IOLTA did not exist.[2] It is not, of course, that the federal and state regulatory combination includes some rule that is facially inconsistent with the general principle that interest follows principal; the components of the regulatory structure do not even directly address the question of who owns interest. Indeed, the most obvious relevance of the regulatory provisions and their effects is to the issues of whether IOLTA results in a taking of the client's property and whether any such taking requires compensation. And yet by this route the regulatory structure becomes relevant to the property issue as well, simply because the way we may ultimately resolve the taking and compensation issues bears on the way we ought to resolve the property issue. If it should turn out that within the meaning of the Fifth Amendment, the IOLTA scheme had not taken the property recognized today, or if it should turn out that the "just compensation" for any taking was zero, then there would be no practical consequence for purposes of the Fifth Amendment in recognizing a client's property right in the interest in the first place; any such recognition would be an inconsequential

---

[1] The highest court of Texas has not understood the general principle that a property right in interest always follows property in principle in a way that supports respondents in this IOLTA challenge. See *Sellers* v. *Harris County*, 483 S. W. 2d 242, 243 (Tex. 1972) (owner of principal is entitled to interest, less administrative and accounting costs). *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155 (1980), is not on point precisely because it dealt with interest actually in the hands of the fiduciary, net of any administrative expense.

[2] These unchallenged state and federal rules clearly fall within the general category of relevant law defining property subject to constitutional protection, see *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 577 (1972) ("Property interests" are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law").

abstraction. Cf. *Hooker* v. *Burr*, 194 U. S. 415, 419 (1904) (If a contractual obligation is impaired, but the obligor is "not injured to the extent of a penny thereby, his abstract rights are unimportant"). The significance of the regulatory structure, and the issues of taking and compensation, should therefore be considered today.

Approaching the property issue in conjunction with the two others would, in fact, be entirely faithful to the Fifth Amendment, for as we have repeatedly said its Takings Clause does nothing to bar the government from taking property, but only from taking it without just compensation, see, *e. g., First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 315 (1987); *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172, 194 (1985). It thus makes good sense to consider what is property only in connection with what is a compensable taking, an approach to Fifth Amendment analysis that not only would avoid spending time on what might turn out to be an entirely theoretical matter, but would also reduce the risk of placing such undue emphasis on the existence of a generalized property right as to distort the taking and compensation analyses that necessarily follow before the Fifth Amendment's significance can be known.[3]

---

[3] For example, with respect to the determination whether government regulation "goes too far" in diminishing the value of a claimant's property, we have repeatedly instructed that a "parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable." *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602, 644 (1993); see also *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 130–131 (1978). With its narrow focus on a party's right to any interest generated by its principal, the Court's opinion might be read (albeit erroneously, in my view) to mean that the accrued interest is the only property right relevant to the question whether IOLTA effects a taking.

That is not to say, of course, that we should resolve either the taking or compensation issues here, for the Fifth Circuit did not address them. Rather, we should determine here whether either of the remaining issues might reasonably be resolved against respondents; if so, we should not abstract the property issue for resolution in their favor now, but should return the case to the Court of Appeals to consider all three issues before resolving the first. Suffice it to say that both the taking and compensation questions are serious ones for respondents.

First, as to a taking, we start with *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104 (1978), and its guidance about certain sorts of facts that are of particular importance in what is supposed to be an "ad hoc, factual" enquiry, *id.,* at 124, into whether the government has "go[ne] too far." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922). Attention should be paid to the nature of the government's action, its economic impact, and the degree of any interference with reasonable, investment-backed expectations. *Penn Central, supra,* at 124. Here it is enough to note the possible significance of the facts that there is no physical occupation or seizure of tangible property, cf. *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419, 426 (1982) (noting that physical intrusion is "unusually serious" in the takings context); that there is no apparent economic impact (since the client would have no net interest to go in his pocket, IOLTA or no IOLTA); and that the facts present neither anything resembling an investment nor (for the reason just given) any apparent basis for reasonably expecting to obtain net interest. While a court would certainly consider any proposal that respondents might make for a departure from the *Penn Central* approach to vindicating the Fifth Amendment in these circumstances, application of *Penn Central* would not bode well for claimants like respondents.

Second, as to the just compensation requirement, the client's inability to earn net interest outside IOLTA, due to

the unchallenged federal and state regulations, raises serious questions about entitlement to any compensation (which, if required, would convert any "taking" into a wash transaction from the client's standpoint). "Just compensation" generally means "the full monetary equivalent of the property taken." *United States* v. *Reynolds*, 397 U. S. 14, 16 (1970). In determining the amount of just compensation for a taking, a court seeks to place a claimant "'in as good a position pecuniarily as if his property had not been taken.'" *United States* v. *564.54 Acres of Monroe and Pike County Land*, 441 U. S. 506, 510 (1979) (quoting *Olson* v. *United States*, 292 U. S. 246, 255 (1934)), calculating any loss objectively and independently of the claimant's subjective valuation, see, e. g., *Kimball Laundry Co.* v. *United States*, 338 U. S. 1, 5 (1949).

Thus, in deciding what award would be needed to place the client respondent in as good a position as he would have enjoyed without a taking, a court presumably would look to the claimant's putative property interest as it was or would have been enjoyed in the absence of IOLTA, cf. *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 195 (1910), and consequently would measure any required compensation by the claimant's loss, not by the government's (or the public's) gain, *ibid.* This rule would not obviously produce much benefit to respondents. While it has been suggested in their favor that a cognizable taking may occur even when value has been enhanced, on the supposed authority of *Loretto, supra*, at 437, n. 15, that case dealt only with physical occupation, it rested on no finding that value had actually been enhanced, and it held nothing about the legal consequences of an actual finding that enhancement had occurred. The Court today makes a further suggestion of a way in which respondents might deflect the objection that they have lost nothing, when it observes that the notion of property is not limited by the concept of value, *ante*, at 170. But the Court makes the point by equating the government's seizure

of funds from the pocket of a failing business owner with IOLTA's disposition of funds the client never had or could have received. Neither the equation, nor its relevance to the Fifth Amendment's guarantee of just compensation, is immune to question.

But, however these issues of taking and compensation may someday be adjudicated, two things are clear now: the issues are serious and they might be resolved against respondents. If that should happen, today's holding would stand as an abstract proposition without significance for the application of the Fifth Amendment.

If abstraction were guaranteed to be harmless, of course, an abstract ruling now and again would not matter much, beyond the time spent reaching it. But our law has been wary of abstract legal propositions not only because the common-law tradition is a practical one, but because abstractions pose their own peculiar risks. As THE CHIEF JUSTICE noted in a different but related context, there is a danger in "cutting loose the notion of 'just compensation' from the notion of 'private property.'" *Almota Farmers Elevator & Warehouse Co.* v. *United States,* 409 U. S. 470, 486 (1973) (REHNQUIST, J., dissenting); see also *id.,* at 482–483 ("While the inquiry as to what property interest is taken by the condemnor and the inquiry as to how that property interest shall be valued are not identical ones, they cannot be divorced without seriously undermining a number of rules dealing with the law of eminent domain").

One may wonder here not only whether the theoretical property analysis may skew the resolution of the taking and compensation issues that will follow, but also how far today's holding may unsettle accepted governmental practice elsewhere. By recognizing an abstract property right to interest "actually 'earned'" by a party's principal, *ante,* at 168, does the Court not raise the possibility of takings challenges whenever the government holds and makes use of the principal of private parties, as it frequently does? When, for

example, the National Government, or a State, has engaged in excessive tax withholding, it does not refund the interest earned between the time of withholding and the issuance of a refund. For any number of reasons unrelated to the recognition or nonrecognition of a generalized property right in interest, but tied to the questions of takings and compensation, it seems unlikely that such withholding practices would violate the Fifth Amendment. Nevertheless, the Court's abstract ruling may encourage claims of just this sort.

To avoid the dangers of abstraction, I would therefore vacate the judgment of the Court of Appeals and remand for plenary Fifth Amendment consideration. If, however, the property interest question is to be considered in the abstract, I would recast it and answer it as JUSTICE BREYER has done in his own dissenting opinion, which I join.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The question presented is whether "interest earned on client trust funds," which would "not earn interest" in the absence of a special "IOLTA program," amounts to a "property interest of the client or lawyer" for purposes of the Fifth Amendment's Takings Clause. Brief for Petitioners i; Brief for Respondents i; see U. S. Const., Amdt. 5 ("nor shall private property be taken for public use, without just compensation").

The question presented is premised on four assumptions: First, that lawyers sometimes hold small amounts of clients' funds for short periods of time; second, that because of federal tax and banking rules and regulations, such funds normally could not earn interest during that time; third, that state Interest on Lawyers Trust Account (IOLTA) rules require lawyers to place such funds in a special account where, mixed with other funds, they will earn interest; and fourth, that IOLTA rules require that interest earned on these funds

is distributed to groups that represent low-income individuals rather than to the lawyers or their clients who own the funds.

Insofar as factual circumstances such as these raise a Fifth Amendment question, I agree with JUSTICE SOUTER that the question is whether Texas, by requiring the placing of the funds in special IOLTA accounts and depriving the funds' owners of the subsequently earned interest has temporarily "taken" what is undoubtedly "private property," namely, the client's funds, *i. e.*, the principal, without "just compensation." To answer this (appropriately framed) question, the parties and the lower courts would have to consider whether the use of the principal in the fashion dictated by the IOLTA rules amounts to a deprivation of a property right, and, if so, whether the government's "taking" required compensating the owner of the funds, where it did not deprive the funds' owners of interest they might have otherwise received. But the Court of Appeals did not address this latter question. See *ante*, at 179 (SOUTER, J., dissenting).

Although I believe it wrong to separate Takings Clause analysis of the property rights at stake from analysis of the alleged deprivation, I have considered the question presented on its own terms. And, on the majority's assumptions, I believe that its answer is not the right one. The majority's answer rests upon the use of a legal truism, namely, "interest follows principal," and its application of a particular case, namely, *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155 (1980). See *ante*, at 166, 171. In my view, neither truism nor case can answer the hypothetical question the Court addresses.

The truism does not help because the question presented assumes circumstances that differ dramatically from those in which interest is ordinarily at issue. Ordinarily, principal is capable of generating interest for whoever holds it. Here, by the very terms of the question, we must assume

that (because of pre-existing federal law) the client's principal could not generate interest without IOLTA intervention. That is to say, the client could not have had an expectation of receiving interest without that intervention. Nor can one say that IOLTA rules excluded, or prevented, the client's use of his principal to generate interest that would otherwise be his. Under these circumstances, what is the property right of the client that IOLTA could have "confiscat[ed]"? *Ante*, at 167.

The most that Texas law here could have taken from the client is not a right to use his principal to create a benefit (for he had no such right), but the client's right to keep the client's principal sterile, a right to prevent the principal from being put to productive use by others. Cf. *National Bd. of YMCA* v. *United States*, 395 U. S. 85, 92–93 (1969) (noting that government deprivation of property requiring compensation normally takes from an owner *use* that the owner may otherwise make of the property). And whatever this Court's cases may have said about the constitutional status of such a right, they have *not* said that the Constitution forces a State to confer, upon the owner of property that cannot produce anything of value for him, ownership of the fruits of that property should that property be rendered fertile through the government's lawful intervention. Cf., *e. g.*, *United States ex rel. TVA* v. *Powelson*, 319 U. S. 266, 276 (1943) (no need to pay for value that the "power of eminent domain" itself creates); *City of New York* v. *Sage*, 239 U. S. 57, 61 (1915) (city need not pay for value added by unifying parcels where unification impracticable absent eminent domain); *United States* v. *Twin City Power Co.*, 350 U. S. 222, 228 (1956) (to require payment for value created by government "would be to create private claims in the public domain"). Thus the question is whether "interest," *earned only as a result of IOLTA rules* and earned upon otherwise *barren* client principal, "follows principal." The slogan "interest follows principal" no more answers *that* question than

does King Diarmed's legendary slogan, "[T]o every cow her calf." A. Birrell, Seven Lectures on The Law and History of Copyright in Books 42 (1889) (internal quotation marks omitted). Cf. *Berkey* v. *Third Avenue Railway Co.*, 244 N. Y. 84, 94, 155 N. E. 58, 61 (1926) (Cardozo, J.) ("Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it").

Nor can *Webb's Fabulous Pharmacies* answer the question presented. But for state intervention the principal in that case could have, and would have, earned interest. See 449 U. S., at 156–157, and nn. 1, 2 (state law required party to deposit funds with court, authorized court to hold the funds in an interest-bearing account, and allowed the court to claim the interest as well as a fee). Here, federal law ensured that, in the absence of IOLTA intervention, the client's principal would earn nothing. *Webb's Fabulous Pharmacies* holds that a state law which places *that* ordinary kind of principal in an interest-bearing account (which interest the State unjustifiably keeps) takes "private property . . . for public use without just compensation." That holding says little about *this* kind of principal, principal that otherwise is barren. Nor do cases that find a private interest in property with virtually no economic value tell us to *whom* the fruits of that property belong when that property bears fruit through the intervention of another. *Ante*, at 169–170 (citing *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982); *Hodel* v. *Irving*, 481 U. S. 704, 715 (1987)).

If necessary, I should find an answer to the question presented in other analogies that this Court's precedents provide. Land valuation cases, for example, make clear that the value of what is taken is bounded by that which is "lost," not that which the "taker gained." *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 195 (1910) (opinion of Holmes, J.); see also *United States* v. *Miller*, 317 U. S. 369, 375 (1943) ("[S]pecial value to the condemnor . . . must be excluded as an element of market value"); *United States*

v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 75–76 (1913). This principle suggests that the government must pay the current value of condemned land, not the added value that a highway it builds on the property itself creates. It also suggests that condemnation of, say, riparian rights in order to build a dam must be followed by compensation for these rights, not for the value of the electricity that the dam would later produce. Cf. *id.,* at 76; *Twin City Power Co., supra,* at 226–228; *United States* v. *Appalachian Elec. Power Co.,* 311 U. S. 377, 423–424, 427 (1940). Indeed, no one would say that such electricity was, for Takings Clause purposes, the owner's "private property," where, as here, in the absence of the lawful government "taking," there would have been no such property.

These legal analogies more directly address the key assumption raised by the question presented, namely, that "absent the IOLTA program," no "interest" could have been earned. I consequently believe that the interest earned is *not* the client's "private property."

I respectfully dissent.