**Jerry Dempsey McINTYRE,**
**Plaintiff–Appellant,**

v.

**Robert BAYER, Defendant–Appellee.**

**No. 01–55169.**

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 7, 2002.*

Submission Deferred Nov. 14, 2002.

Resubmitted Aug. 7, 2003.

Filed Aug. 13, 2003.

Jerry Dempsey McIntyre, Carson City, Nevada, filed briefs pro se.

Frankie Sue Del Papa, Attorney General of the State of Nevada, Carson City, Nevada, and Gabriel D. Lither, Deputy Attorney General, filed a brief for the defendant-appellee.

Before STAPLETON,** O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

---

* The panel unanimously finds this case suitable for decision without oral argument. See Fed. R.App. P. 34(a)(2).

** The Honorable Walter K. Stapleton, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

## OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether a state statute, requiring interest generated by inmate trust accounts to be retained by prison authorities and expended for the benefit of the prison population as a whole, effects an unconstitutional taking.[1]

### I

Jerry Dempsey McIntyre is incarcerated at the Warm Springs Correctional Center in Carson City, Nevada. Like all inmates in Nevada prisons, he is required to keep his money, including wages earned during incarceration as well as any money received from outside sources, in a personal property trust fund run by the State of Nevada. *See* Nev.Rev.Stat. § 209.241(1) (1995).[2] Inmates are allowed to make withdrawals from their trust accounts "for personal needs," *id.* § 209.241(2)(b), and also can send checks outside the prison that are drawn on such accounts. While the state is required to "keep ... a full and accurate account of the[inmate's] money," *id.* § 209.241(2)(a), the inmate trust accounts are pooled together to generate interest. "The interest and income earned on the money in the fund, after deducting any applicable charges, must be credited

to the offenders' store fund." *Id.* § 201.241(3). This "store fund," in turn, "must be expended for the welfare and benefit of all offenders." *Id.* § 209.221(3).[3]

Nevada law also provides that the inmate may be required, at the discretion of the director of the Department of Prisons ("NDOP"), to contribute a portion of his wages to a separate "fund for the compensation of victims of crime." *Id.* § 209.463(a)(1) ("victims fund"). According to the most recent records available at the time he instituted his suit, McIntyre, who held a job in the prison library, had paid a total of $105.23 into the victims' fund.

### A

On January 22, 1997, McIntyre filed a pro se civil rights action against defendant Robert Bayer, the director of the NDOP. McIntyre contended, among other things, that the defendant had committed an unconstitutional taking by not returning to McIntyre any of the interest earned on the funds in his inmate trust account.[4] Both McIntyre and Bayer moved for summary judgement.

In an order entered on February 19, 1998, the district court found that, pursu-

---

1. We resolve McIntyre's due process claim in a memorandum disposition filed this date.

2. The statutes at issue in this case have been amended many times over the past several years. We apply the versions of the statutes in place when McIntyre first filed this action.

3. In addition to receiving the benefits of general-welfare expenditures from the store fund, prisoners are able to purchase items from the prison store itself, including food, clothing, and other personal items.

4. McIntyre would later assert—as he does before this court—that it is Nev.Rev.Stat. § 209.221 (1995), not § 209.241 (1995), that effects the unconstitutional taking of which he complains. This is incorrect. Section 209.221 establishes the "Offenders' Store

Fund," which "must be expended for the welfare and benefit of all offenders." Nev.Rev. Stat. § 209.221(3) (1995). As noted above, Nev.Rev.Stat. § 209.241 mandates that interest and income earned on the money in the prisoners' personal property fund "be credited to the offenders store fund." (Earlier versions of § 209.241 required only that "[t]he interest and income earned on the money in the fund, after deducting any applicable charges, must be credited to the fund." Nev. Rev.Stat. § 209.241(3) (1993).) McIntyre's takings claim, however, is not about *where* the interest goes, but rather that it has been taken from him in the first place—and *that* alleged taking is accomplished by NRS § 209.241, not NRS § 209.221.

ant to this court's holding in *Tellis v. Godinez,* 5 F.3d 1314, 1317 (9th Cir.1992), "the language of the Nevada Revised Statute created a protected property interest in interest and income actually earned and deposited in a prisoner's personal property fund." The district court then went on to note, however, that the statute was modified in the aftermath of this court's *Tellis* decision to state that "the provisions of this chapter do not create a right on behalf of any offender to any interest or income that accrues on the money in the prisoner's personal property fund." Nev.Rev. Stat. § 209.241(5) (1995). In light of the fact that the revised statute—denying McIntyre a right to interest on his account—went into effect on October 1, 1995, and given the two-year statute of limitations for § 1983 actions in Nevada, *see Wilson v. Garcia,* 471 U.S. 261, 280, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the district court concluded that "the applicable period for McIntyre's[takings] claim is January 22, 1995 [two years prior to the filing of his claim] through September 30, 1995 [the eve of the amended statute's effective date]." Based upon the plaintiff's account records, the court granted McIntyre's motion for summary judgment as to his first claim and found that he was entitled to interest totaling $3.93. The district court then summarily rejected McIntyre's constitutional challenge to Nev.Rev.Stat. § 209.463, concluding that "NRS § 209.241[sic] is constitutional so long as it is not applied retroactively." The court therefore rejected McIntyre's due process claim and granted summary judgment to the defendant.

### B

McIntyre timely appealed to this court which, in an unpublished disposition, vacated the district court's 1998 order and remanded for further consideration. *See McIntyre v. Bayer,* 182 F.3d 926, 1999 WL 274648 (9th Cir.(Nev.1999)) (unpublished disposition). We noted that the district court's reasoning with respect to McIntyre's first claim—i.e., that the statute had been revised to take away any property rights in the interest earned on prisoner accounts—had been called into question, if not completely foreclosed, by *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), and *Schneider v. California Department of Corrections,* 151 F.3d 1194 (9th Cir.1998). The panel also pointed out that, although the district court had held that "Nev.Rev.Stat. § 209.241 is constitutional so long as it is not applied retroactively," "the crime victim deduction provisions that McIntyre challenges are codified at Nev.Rev.Stat. § 209.463—*not* at Nev. Rev.Stat. § 209.241." *McIntyre,* 1999 WL 274648 at *1.

### C

On remand, the district court ordered the parties to provide supplemental briefing on the takings issue in light of our *vacatur* and the two cases cited therein. Thereafter, in an order entered January 8, 2001, the district court held that Nev.Rev. Stat. § 209.241 did not effect an unconstitutional taking of McIntyre's property.

McIntyre timely appealed.

### II

The Fifth Amendment provides that "private property [shall not] be taken for public use without just compensation." U.S. Const. Amend. V. In order to state a claim under the Takings Clause, a plaintiff must first establish that he possesses a constitutionally protected property interest. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000–01, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). When considering prison accounts of the sort at issue here, we have held that the interest income generated by the accounts constitutes a property interest "sufficiently fundamental that

states may not appropriate it without implicating the Takings Clause." *Schneider*, 151 F.3d at 1201.[5] Nev.Rev.Stat. § 209.241(3) (1995) provides that "[t]he interest and income earned on the money in the [prisoners' personal property] fund, after deducting any applicable charges, *must be* credited to the offenders' store fund." (emphasis added). It is therefore clear from the plain language of the statute that the state appropriates the interest generated by the personal property fund and spends it for the benefit of the prison population as a whole—that is, for public use.

As the Supreme Court has recently noted, the determination that the state has taken the prisoners' interest "does not end our inquiry," but rather requires us to "determine whether any 'just compensation' is due." *Brown v. Legal Found. of Wash.*, —— U.S. ——, 123 S.Ct. 1406, 1419, 155 L.Ed.2d 376 (2003). In *Brown*, the Court revisited the issue it first considered in *Phillips*, namely whether the Fifth Amendment's Takings Clause bars the appropriation of the interest earned on client funds held in trust by attorneys.[6] In *Phillips*, the Court concluded that the interest earned on such accounts "is the 'private property' of the owner of the principal,"

524 U.S. at 172, 118 S.Ct. 1925, but did not decide whether the state's transfer of that interest to charitable entities that provide legal services for the poor violated the Fifth Amendment. In *Brown*, the Court reached the latter issue and concluded that the transfer of interest from IOLTA accounts does *not* constitute a taking without just compensation. "[J]ust compensation," the Court held, "is measured by the *net value* of the interest that was *actually earned*" by the owner of the principal. *Brown*, 123 S.Ct. at 1420 n. 10 (emphasis added). The Court reasoned that because the laws governing IOLTA required that any funds that *could* generate interest be maintained in an interest-bearing account, any funds actually deposited in a IOLTA account, by definition, could *not* generate interest. *See id.* Thus, "[b]ecause ... compensation is measured by [the] pecuniary loss" suffered by an individual, and because that loss "is zero whenever the [IOLTA] law is obeyed," the Court concluded that "there has been no violation of the Just Compensation Clause of the Fifth Amendment ...." *Id.* at 1421.

As if to emphasize the unique nature of IOLTA laws, the Supreme Court made clear that, although those laws ensured that clients whose funds could generate

---

**5.** In reaching this conclusion, it is important to note, we also made clear that "constitutionally protected property rights can—and often do—exist *despite* statutes ... that appear to deny their existence." *Schneider*, 151 F.3d at 1199 (emphasis in original). Thus, our analysis of McIntyre's takings claim proceeds unencumbered by the statutory admonition, set forth in Nev.Rev.Stat. § 209.241(4), that "[t]he provisions of this chapter do not create a right on behalf of any offender to any interest or income that accrues on the money in the prisoners' personal property fund." To consider ourselves bound by the state's bald assertion regarding the inmates' rights (or lack thereof) in the interest generated by the property fund would be to allow the state to "unilaterally dictate the content of—indeed, altogether opt out of—both the Takings

Clause and the Due Process Clause simply by statutorily recharacterizing traditional property-law concepts." *Schneider*, 151 F.3d at 1201. This we cannot do.

**6.** The laws at issue in *Phillips* and *Brown* work as follows: At the time of deposit, and upon a determination by counsel, client funds capable of generating interest on their own must be maintained in an interest-bearing account, with any such interest being returned to the client. Client funds that could *not* otherwise generate interest standing alone had to be deposited in a special "interest on lawyer's trust" account, or IOLTA account. The law further required any interest generated by the funds pooled in IOLTA accounts to be transferred to organizations providing legal services for the poor.

interest would, in fact, receive that interest, "[a] law that requires that the interest on [an individual's] funds be transferred to a different owner for a legitimate public use ... could be a *per se* taking requiring the payment of 'just compensation'...." *Id.* As noted above, it is clear that by transferring the interest earned on the pooled resources of prisoner's property fund to the offenders' store fund to be expended "for the welfare and benefit of all offenders," Nev.Rev.Stat. § 209.221 does effect a transfer of the interest earned from the prisoners to the state. It is equally clear, though, that the costs the state incurs in administering the prisoners' property fund far out-strip the gross interest earned by the fund. Indeed, the record reflects that, in the most recent fiscal year for which we have data in the record, the NDOP expended $393,178 to provide the prisoners with personal property fund accounts, while the amount of interest transferred from the prisoners' personal property fund into the offenders' store fund was $108,485. In the aggregate, then, the prisoners' property fund generates *no net gain at all,* but rather a substantial loss.

What is not clear on the record before us, however, is whether the interest earned by *McIntyre's* principal is exceeded by his share of the costs of administering the prisoners' personal property fund.

This information, however, is precisely what we need to know in order to determine whether the director has taken McIntyre's interest without just compensation. For, as the Supreme Court noted in *Brown,* "[i]t may be that the difference between what a pooled fund earns, and what the individual clients ... lose, adds up to enough to [generate interest] while not depriving any of the clients ... of just compensation." *Brown,* 123 S.Ct. at 1420 (quoting *Wash. Legal Found. v. Legal Found. of Wash.,* 271 F.3d 835, 883 (9th Cir.2001)) (Kozinski, J., dissenting). That is to say, it may well be that the costs of administering the prisoners' property fund are so high—and the interest earned on McIntyre's account so low—that there is no net loss and therefore no compensation owed. The district court, looking at the aggregate amounts spent on running the fund and at the aggregate amount of interest generated, rightly concluded that there was a net loss in the prisoners' property fund as a whole. While perhaps understandable, the district court's inference that, because the fund as a whole operated at a net loss, McIntyre himself could not have suffered a taking without compensation, cannot be squared with the *per se* analysis that, as the Supreme Court has made clear, remains applicable to cases (such as this one) involving the state's appropriation of interest income.[7] Be-

---

**7.** In *Brown,* the Court noted "[s]everal hypothetical cases" in the IOLTA context in which further factual development might reveal a net loss deserving of just compensation:

Suppose $2,000 is deposited into a lawyer's trust account paying 5% and stays there for two days. It earns about $.55, probably well under the cost of a stamp and envelope, along with clerical expenses, needed to send the $.55 to the client. In that case, the client's financial loss from the taking, if a reasonable charge is made for the administrative expense, is nothing. The fair market value of the right to receive $.55 by spending perhaps $5.00 to receive it would

be nothing. On the other hand, suppose, hypothetically, that the amount deposited into the trust account is $30,000, and it stays there for 6 days. The client's loss here would be about $29.59 if he does not get the interest, which may well exceed the reasonable administrative expense of paying it to him out of a common fund. It is hard to see how just compensation could be zero in this hypothetical taking, even though it would be in the $2,000 for 2 days hypothetical taking.

*Id.* at 1420 (citation and internal quotation marks omitted).

cause it is clear that Nev.Rev.Stat. § 209.241 does effect a taking of inmate interest, and because, on this record, we cannot determine whether there is any just compensation owed to McIntyre, the issue of compensation remains "a practical question ... undeveloped on this record." *Brown*, 123 S.Ct. at 1420 (internal quotation marks omitted).[8] We therefore vacate the district court's grant of summary judgment to Bayer on McIntyre's takings claim and remand for further proceedings not inconsistent with this opinion.

### III

Because we conclude that, in light of the Supreme Court's decision in *Brown*, further factual development is needed to determine whether McIntyre suffered any net loss sufficient to entitle him to compensation, the district court's grant of summary judgment to the NDOP on McIntyre's takings claim is

VACATED and REMANDED for further proceedings consistent with this opinion.

---

8. NDOP does note that, as of the time of this appeal, McIntyre's account contained more than $500 on only two days out of the seven-and-a-half years of his confinement. They further assert that, were McIntyre's funds placed in a bank at an interest rate of 5.04%, he would have earned just $65.25 in interest. These facts suggest that it is *unlikely* that McIntyre suffered a net loss requiring just compensation, but they fail to establish that this in fact is the case.