**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WILLIAM F. WASHLEFSKE,
        *Plaintiff-Appellant,*

v.

ANDREW J. WINSTON; RONALD J.
ANGELONE,

        *Defendants-Appellees.*

No. 99-7321

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca B. Smith, District Judge.
(CA-98-1466)

Argued: September 29, 2000

Decided: December 6, 2000

Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Traxler joined. Judge Widener wrote a concurring
opinion.

---

## COUNSEL

**ARGUED:** Neal Lawrence Walters, UNIVERSITY OF VIRGINIA
SCHOOL OF LAW APPELLATE LITIGATION CLINIC, Char-
lottesville, Virginia, for Appellant. Mark Ralph Davis, Senior Assis-
tant Attorney General, Criminal Law Division, OFFICE OF THE
ATTORNEY GENERAL, Richmond, Virginia, for Appellees. **ON**

**BRIEF:** Terry McGarrity, Third Year Law Student, UNIVERSITY OF VIRGINIA SCHOOL OF LAW APPELLATE LITIGATION CLINIC, Charlottesville, Virginia, for Appellant. Mark L. Earley, Attorney General, Criminal Law Division, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

We are presented with the important question of whether William Washlefske, an inmate in the custody of the Virginia Department of Corrections, was deprived of his private property without just compensation in violation of the Fifth Amendment's Takings Clause when Virginia expended the interest earned from Washlefske's prison accounts for the general benefit of inmates under the State's care. This question is one of first impression in this circuit. The district court concluded that although Washlefske had a property interest in the interest earned on his prison accounts, an unconstitutional taking did not occur because Washlefske voluntarily chose to place his funds in the accounts and because he received the benefits of the State's expenditure of the interest.[1]

We affirm the judgment of the district court, but we do so for different reasons. Because Washlefske's limited right to the funds in his prison accounts does not derive from any traditional principle of common law but from a Virginia statute, he was not deprived of any property, for the purposes of a Takings Clause analysis, when the Department of Corrections followed the dictates of that statute in using the interest generated from these accounts. In reaching this conclusion, we recognize the unfortunate conflict we create with the

---

[1] Three other decisions in the Eastern District of Virginia have resolved similar claims against prisoners using substantially the same reasoning relied upon by the lower court in this case. *See Chalmers v. Winston*, 95 F. Supp. 2d 536, 542-45 (E.D. Va. 2000); *Gilreath v. Winston*, No. 3:98CV757, slip op. at 6-13 (E.D. Va. Mar. 16, 2000); *Titus v. Winston*, No. 2:98CV1428, slip op. at 6-10 (E.D. Va. Jan. 5, 2000).

Ninth Circuit in *Schneider v. California Department of Corrections*, 151 F.3d 1194 (9th Cir. 1998), in which the court held, without conducting an inquiry under traditional principles of property law, that a convicted felon enjoyed a private property interest in the funds held in his prison account.

I

Washlefske was committed to the custody of the Virginia Department of Corrections in 1992 and has since been confined by the Department at the Powhatan Correctional Center. For labor performed while in prison, Washlefske "earns" an average of $108.76 each month, which is credited to his "spend account." He maintains an average monthly closing balance in this account of $67.05. He also has a $25 standing balance in his "hold account," which is maintained to provide him a discharge allowance. These accounts are created and maintained pursuant to the terms of Virginia statutes and regulations.

According to Virginia law, inmates under the jurisdiction of the Department of Corrections receive an allowance for each day of labor performed in a manner satisfactory to State officials. *See* Va. Code Ann. §§ 53.1-42, 53.1-43. As the parties acknowledged at oral argument, inmates receive approximately $.90 per hour. The amounts credited to each inmate accumulate in a "spend account" maintained by the State Board of Corrections and may be drawn upon by the inmate for purposes authorized by the Board. The inmates may use the funds in their "spend accounts" to purchase items from the prison commissary or from approved outside sources. They may also have funds sent outside the prison to designated persons, to be invested for the prisoners' benefit in interest-bearing accounts. Amounts that the inmates do not spend while incarcerated are given to them when they are discharged, provided that they have served at least eight months. *See* Va. Code Ann. § 53.1-190. While in prison, however, the inmates are not given any cash, but enjoy only a right to draw upon these funds to purchase a limited number of approved items. Cash in Virginia prisons is contraband. *See Hanvey v. Blankenship*, 631 F.2d 296, 297 (4th Cir. 1980) (per curiam); Va. Code Ann. § 53.1-26.

Pursuant to regulations promulgated by the State Board of Corrections, ten percent of an inmate's allowance is placed in a "hold

account" until $25 accumulates. *See* State Bd. of Corrections Policy No. 20-7.1. This sum is held until the inmate is discharged, and only then is it paid to him. *See* Va. Code Ann. § 53.1-190. And if $25 does not accumulate in this account, each prisoner is nevertheless given a minimum of $25 upon his discharge from prison, paid from Department of Corrections funds. *See id.*

The funds in the "spend" and "hold" accounts of all prisoners are pooled, and those amounts that are not needed to meet the immediate requests of prisoners are invested at the discretion of the Director of the Department of Corrections. *See* Va. Code Ann. § 53.1-44. Income earned in this pooled account "may be used by the Director for the benefit of the prisoners under his care." *Id.* At Powhatan Correctional Center, where Washlefske is incarcerated, this income has been used to purchase library books, newspaper and magazine subscriptions, exercise equipment, items for family visiting day, and other "extras."

During 1998, the pooled account containing funds from all Department of Correction facilities produced income for Powhatan Correctional Center in the amount of $5,479.45. The Powhatan Correctional Center also earned an average of $59.86 of interest per month on its own checking account maintained with "spend" and "hold" account funds held to address the day-to-day requests of inmates.

Washlefske commenced this action in December 1998 under 42 U.S.C. § 1983, alleging that the State's use of interest income derived from his "spend" and "hold" accounts without just compensation to him violates the Takings Clause of the Fifth Amendment as applied to the States through the Fourteenth Amendment. He requested a declaratory judgment that the State's use of his interest income violated his Constitutional rights, restitution of interest taken, and an injunction requiring the State to credit his accounts with any interest earned in the future.

On cross motions for summary judgment, the district court entered judgment in favor of the State. *See Washlefske v. Winston*, 60 F. Supp. 2d 534, 543 (E.D. Va. 1999). The court ruled that although Washlefske had a property interest in the interest earned on his prison accounts, the State's actions did not result in an unconstitutional taking because (1) Washlefske "voluntarily cho[se] to place funds in the

accounts administered by the prison," and (2) he received just compensation in the form of benefits from the items that the Department of Corrections purchased with the income from the pooled funds. *Id.*

This appeal followed.

## II

At the outset, we review our jurisdiction to consider whether Washlefske's Takings Clause claim is sufficiently ripe for federal judicial consideration under 42 U.S.C. § 1983. Ripeness in this context does not refer to Article III's "case or controversy" requirement, for that is plainly satisfied here: Washlefske claims that money belonging to him was taken from his prison accounts. The conduct Washlefske challenges is undisputed and arises from an ongoing application of Virginia statutes. Rather, the question is one of prudential ripeness — whether we *should* exercise federal jurisdiction. *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733 n.7 (1997). This issue springs from the decision in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), where the Supreme Court held that a landowner's claim — that State land-use regulations as applied to him had effected an uncompensated taking of his property — was premature and, therefore, not yet ripe for consideration in federal court. The Supreme Court reasoned that because the State agencies had not yet "arrived at a definitive position on the issue that inflicts an actual, concrete injury," *Williamson County*, 473 U.S. at 193, there had been no final decision on the nature and impact of the State's actions, and the plaintiff's injury in fact was too uncertain to satisfy the requirements of prudential ripeness. In *Suitum*, however, the "final decision" requirement of *Williamson County* was found to have been satisfied when the state regulatory process had come to an end and the landowner had to take no further administrative steps to obtain the state's final position. "The demand for finality [was] satisfied by Suitum's claim, . . . there being no question there about how the 'regulations at issue [apply] to the particular land in question.'" *Suitum*, 520 U.S. at 739 (quoting *Williamson County*, 473 U.S. at 191) (second alteration in original).

In this case, the finality of the State's position has not been questioned; the statute's language is clear and its impact upon Washlefske

is uncontroverted. According to Washlefske's complaint, he claims a property interest in the principal in his prison accounts and, as an incident thereto, a property interest in the interest earned on that principal. Not only is the State's use of the interest uncontroverted, but also its amount is readily calculable, more than satisfying the Supreme Court's prudential ripeness requirements. *Cf. Suitum*, 520 U.S. at 740-42 (finding claim ripe when value of property taken had not been determined, but the right to the property was certain); *see also Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 71 n.15 (1978) (noting that the Declaratory Judgment Act authorizes a federal suit declaring a taking unconstitutional "before potentially uncompensable damages are sustained"); *Eastern Enterprises v. Apfel*, 524 U.S. 498, 521 (1998) (plurality opinion) (noting that prudential ripeness is not applicable where "the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds to the government"); *In re Chateaugay Corp.*, 53 F.3d 478, 493 (2d Cir. 1995) (finding declaratory judgment action for unconstitutionality of government takings ripe when only money has been taken). The only question to be determined therefore is the legality of the State's program. If we were, in this circumstance, to require Washlefske to file his claim first in a Virginia court, we would be transforming *Williamson County*'s finality rule into a rule of exhaustion. This result would be in diametric opposition to a foundational decision of modern § 1983 jurisprudence, *Monroe v. Pape*, which held that "[t]he federal remedy is supplementary to the State remedy, and the latter need not be first sought and refused before the federal one is invoked." 365 U.S. 167, 183 (1961).

It is not surprising, therefore, that the Supreme Court, when faced with a similar claim that had reached an identical state of maturity as the claim before us, exercised jurisdiction over the claim without expressing any reservation that jurisdiction was proper. *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 172 (1998) (holding that clients had a protected property interest in the interest in their attorneys' trust accounts). As a Supreme Court plurality observed in *Eastern Enterprises*, "'while we are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was passed *sub silentio*, neither should we disregard the implications of an exercise of judicial authority assumed to be proper' in previous

cases." 520 U.S. at 522 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 307 (1962)).

We therefore conclude that Washlefske's Taking Clause claim is sufficiently mature, defined, and immediate to be ripe for consideration within our jurisdiction.

### III

The Takings Clause of the Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation," and this limitation on governmental power has been imposed on the States through the Fourteenth Amendment, *see Phillips*, 524 U.S. at 163; *Chicago, Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 239 (1897). The Takings Clause *protects* private property; it does not create it. *See Phillips*, 524 U.S. at 164. Thus, in identifying a property interest so protected, we must look to "existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Even though fundamental principles of State property law may define property rights, the Takings Clause nevertheless limits a State's authority to redefine preexisting property rights. Thus, "a State, by *ipse dixit*, may not transform private property into public property without compensation," *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980), nor can it "sidestep the Takings Clause by disavowing traditional property interests long recognized under state law," *Phillips*, 524 U.S. at 167.

In short, we look outside the Takings Clause to traditional rules of property law to determine whether a constitutionally protected property interest exists, and only when a State, through legislation, rule, decision, or other action deprives an owner of such an interest, must it provide just compensation. But, if a statute creates a property right not previously recognized or one broader than that traditionally understood to exist, the property interest so created is defined by the statute and may be withdrawn so long as the State affords due process in doing so. *See Goldberg v. Kelly*, 397 U.S. 254, 262 n.8 (1970) (observing that constitutional restraints apply to withdrawal of welfare rights, which "[i]t may be realistic today to regard . . . more like 'property' than a 'gratuity'"); *see also Zinermon v. Birch*, 494 U.S.

113, 125 (1990) (noting that the deprivation of interests protected by the procedural component of the Due Process Clause are lawful so long as the deprivation occurs consistent with the "guarantee of fair procedure"); *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property").

Washlefske argues that the Supreme Court's decision in *Phillips* establishes conclusively that because the maxim "interest follows principal" is a traditional common law rule, the interest generated from the investment of money constitutes "private property" for purposes of the Takings Clause. *See Phillips*, 524 U.S. at 172 (holding that interest on clients' funds held in attorneys' trust accounts was property of the clients). Virginia does not take issue with the proposition that at common law interest follows principal. It argues more fundamentally that Washlefske, as a prisoner, does not enjoy the same common law property rights in his prison accounts as did the *Phillips*' plaintiffs in their attorney trust accounts. Stated otherwise, the State maintains that the *Phillips* Court never "intended its conclusion . . . to translate to the prison environment." The parties' positions thus require us to determine the nature and extent of Washlefske's interest in his prison accounts.

To promote Virginia's important interest in managing its inmate population and in pursuing rehabilitation efforts, Virginia provides various work programs, which include prison-sponsored programs, *see* Va. Code Ann. § 53.1-41; publicly or privately affiliated programs in the prisons, *see id.* § 53.1-45.1; and work-release programs outside of the prisons, *see id.* § 53.1-60. The State Board of Corrections believes that its work programs are "beneficial to the successful adjustment to incarceration by the prisoner and to his ultimate reintegration within the community. In order that prisoners may become self-sufficient crime-free members of society, participation in these programs is encouraged by the Board." State Bd. of Corrections Policy No. 20-7.1. Although private citizens ordinarily have a constitutionally protected property interest in the wages earned from their labor under employment contracts,[2] *see Lynch v. United States*, 292

---

[2]*Cf.* John Locke, *The Second Treatise of Government* ¶ 27 (1690) ("[Y]et every man has a property in his own person . . . . The labor of

U.S. 571, 579 (1934) (holding that valid contract rights are property that may not be taken by the government without just compensation under the Fifth Amendment), inmates do not. Inmates can be put to work without compensation, and such a policy would not violate any traditional principle of property law. *See Ruffin v. Commonwealth*, 62 Va. (22 Gratt.) 790, 796 (1871). Indeed, at common law a convicted felon not only did not have a property right in the product of his work in prison, but he also forfeited all rights to personal property. *See* 1 William Blackstone, *Commentaries* *299; 4 *id.* *385; *see also Calero-Toledo v. Pierson Yacht Leasing Co.*, 416 U.S. 663, 682 (1974). The common law is carried forward in Virginia "insofar as it is not repugnant to the principles of the Bill of Rights and the Constitution of this Commonwealth." Va. Code Ann. § 1-10; *see also Coleman v. Moody*, 14 Va. (4 Hen. & M.) 1 (1809). Thus, under traditional rules of property law in Virginia, an inmate has no property interest in any "wages" from his work in prison except insofar as the State might elect, through statute, to give him rights. *Cf. Jennings v. Lombardi*, 70 F.3d 994, 995-96 (8th Cir. 1995) (holding that because Missouri law did not create an entitlement to compensation and because its regulation described prisoner wages as "a positive behavior incentive," the prisoner had no property interest in wages); *Hrbek v. Farrier*, 787 F.2d 414, 415-16 (8th Cir. 1986) (concluding that the prisoner had no constitutionally protected property right to full amount of wages earned while incarcerated).

In this case, Virginia statutes create limited rights to funds given to prisoners for work performed while serving their prison terms. These statutes do not take away any preexisting property right; rather, they create a limited property right, defined by the terms of the statute, which do not give him full rights of "possession, control, and disposition" over the amounts "earned" and credited to his accounts. *Phillips*, 524 U.S. at 170. Thus, Washlefske is credited with pay at the rate of $.90 per hour, but he is not entitled to have this money paid to him in cash. He can spend his credits only on items provided in the

his body and the work of his hands, we may say, are properly his. Whatsoever then he removes out of the state that nature has provided and left it in, he has mixed his labor with, and joined to it something that is his own, and thereby makes it his property").

prison's commissary, and he may direct that funds be sent outside of prison to designated persons or for the purchase of outside items, but only subject to the approval of prison authorities. Because Virginia empowers the Director of the Department of Corrections, in his sole discretion, to invest portions of the prisoner's funds in investments for the benefit of inmates, Washlefske does not enjoy the right to exclude others from the use of funds credited to his accounts, nor is he entitled to the interest or other income earned from them. On the contrary, the right-creating statute vests the right to control such interest or income in prison authorities, with the limitation that such funds be used for the benefit of inmates generally. *See* Va. Code Ann. § 53.1-44.

In so limiting an inmate's interest in the funds generated from prison work and held in prison accounts, the Virginia statutes do not deprive inmates of any preexisting property rights. To the contrary, they create limited property rights for penological purposes.

While it is true that at common law interest follows principal, it does so only "as a property right incident to the ownership of the underlying principal." *Phillips*, 524 U.S. at 168. The holding in *Phillips*, as well as that in *Webb's Fabulous Pharmacies*, *assumes* that the claimants had a traditional private property right in the principal and concludes only that, as an incident to that ownership, the claimants also had a property right in the interest. *See Phillips*, 524 U.S. at 164 (noting its assumption that clients' funds deposited in attorneys' trust accounts remained "freely available to the clients upon demand"); *Webb's Fabulous Pharmacies*, 449 U.S. at 160 (beginning its analysis with the observation that the "principal sum deposited in the registry of the law plainly was private property"). Under Virginia law, however, Washlefske had no traditional private property interest in wages "earned" for work in prison. Because Washlefske never had a private property interest in these accounts as defined by common law, but only an interest defined by statute — a statute that gives him limited rights to those funds — he cannot claim that a property interest based on traditional principles of property law was taken. His property interest was that given by statute, and the State never took from him what was created by statute. Therefore, there was not a taking of private property as addressed in the Fifth Amendment.

In reaching this conclusion, we recognize that we reach a result different from that reached by the Ninth Circuit in *Schneider v. Califor-*

*nia Department of Corrections*, 151 F.3d 1194, 1201 (9th Cir. 1998), in which the court held that inmates have a property interest in the interest earned on the funds in their prison accounts. The court in *Schneider* applied the *Phillips* rule that interest follows principal, recognizing interest as a property interest of "common law pedigree" that a state cannot take without just compensation. *Id.* at 1201. But the court never determined who "owned" the principal and to what extent. We believe that an investigation into that question by the Ninth Circuit would have produced the same conclusion that we reach today.

Accordingly, we affirm the judgment of the district court.

*AFFIRMED*

WIDENER, Circuit Judge, concurring:

Although I concur in the result reached in Part II of the opinion of the panel, and all of the balance of the opinion without reservation, I write separately to indicate my opinion that there is no discretion regarding the exercise of jurisdiction to hear this case.

Ripeness, like other justiciability doctrines, is rooted in the case or controversy requirement of Article III. See U.S. Const. Art. III, § 2. Ripeness doctrine addresses whether a dispute has matured to a point that warrants decision because an actual, concrete injury has occurred. See Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d*, § 3532, at 112 (Supp. 2000). In my opinion, there is no question but that the dispute addressed in this decision is ripe.

In *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, the Court held that a regulatory takings claim under the Fifth Amendment is premature until the state has failed to provide adequate compensation. See 473 U.S. 172, 186, 194-95 (1985). In this regard, the Court stated, "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached *a final decision* regarding the application of the regulations to the property at issue." *Williamson County*, 473 U.S. at 186 (emphasis added).

In this case, Washlefske claims he is injured by the ongoing application of a Virginia law that contravenes a right to interest earned on his prison account. The statute's terms make it clear that interest does not necessarily accrue to the prisoners' accounts, thus satisfying the final decision requirement in *Williamson County*. See Va. Code Ann. § 53.1-44 (2000) ("Any income or increment of increase received from the bonds or investments may be used by the Director for the benefit of the prisoners under his care."). No additional state proceedings are necessary to establish that prisoners are not, in fact, entitled to any amount of interest on their prison accounts. And the fact that the State has taken the interest leaves no remaining question as to how the statute is applied. See *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 739 (1997) (holding that demand for finality was satisfied because there were no remaining questions about how the regulations at issue applied). Because the Virginia statute is clear that prisoners are not entitled to interest earned on their prison accounts, and any such interest has been disposed of by the State, I think jurisdiction to hear the case attached, and its exercise was not discretionary. Cf. *Phillips v. Washington Legal Found.*, 524 U.S. 156, 160-63 (1998) (exercising jurisdiction over takings claim with similar procedural history and similar factual background without discussing *Williamson County* ripeness inquiry).