**SOGG, Exr., et al., Plaintiffs,**

v.

**WHITE, Defendant.**

2006-Ohio-4223.]

Court of Common Pleas of Ohio,
Franklin County.

No. 04CVG–08–8028.

Decided Aug. 7, 2006.

Futterman, Howard, Watkins, Wylie & Ashley, Chartered, John R. Wylie, and Charles R. Watkins; Susman, Heffner, & Hurst, L.L.P., and Arthur T. Susman; Thompson Hine L.L.P., William C. Wilkinson, and Craig A. Calcaterra, for plaintiff.

Jim Petro, Attorney General, and William J. Cole and John T. Williams, Assistant Attorneys General, for defendant.

FRYE, Judge.

## *Introduction*

{¶ 1} This case was certified as a class action under Civ.R. 23(B)(2) in order to determine whether a portion of Ohio's Unclaimed Funds Act is unconstitutional because it results in a taking of private property. Amended in 1991 as a significant alteration to the state's program for handling unclaimed funds that began in the 1960s, the statute in question denies private owners of funds any interest on their money while it is held by the state even though, while in state custody, the funds always remain private property. Beyond retaining the interest earnings, the state also collects a five-percent administrative fee upon funds returned to private owners. Interest earned on the tens of millions of dollars returned to private owners each year [1] is taken by the state to underwrite loans to first-time homebuyers and to be used for other public purposes. For the reasons explained hereinafter, this court concludes that the federal and state Constitutions both require the state to pay interest on unclaimed funds held by the defendant and that the first sentence of R.C. 169.08(D) as amended in 1991 is unconstitutional.

## *The Factual Record* [2]

{¶ 2} Wilton Sogg is the executor of his mother's estate. Julia Sogg died, leaving unclaimed funds composed of an insurance-policy claim payment of $40.52, reported to the defendant in 1989 by Blue Cross and Blue Shield, plus dividends of $292.86, reported in 1998 by the Bank of New York. Early in 2004, Mr. Sogg made a claim for those funds. A few months later, the state issued a check for $320.72. The plaintiff was paid interest on his mother's Blue Cross and Blue Shield money calculated until July 26, 1991, when the applicable statute was amended to eliminate payment of interest. For the period after that date, the plaintiff received no interest. In addition, a five-percent fee was deducted from

---

1. In state fiscal year 2005, the Ohio Division of Unclaimed Funds received $175 million in new unclaimed funds and refunded $54 million to 41,000 owners. The balance remaining to be returned to owners of the property was roughly $825 million. Although not yet formally part of the record because the information became available only after the briefings, on July 27, 2006, defendant announced publicly that $210 million was reported as new money to the Ohio Division of Unclaimed Funds during state fiscal year 2006. A total of $64,400,000 was paid out on over 43,000 claims. "Commerce News Release" found at *www.com.state.oh.us/press/display.asp?ID=866* (last visited 8/5/06).

2. The parties filed stipulations of fact on Sept. 30, 2005, and March 2, 2006. The stipulations focus this case squarely upon what the parties agree is a purely legal issue. The professionalism of counsel throughout this case, particularly in streamlining the factual record, reflects the best traditions of the bar.

the amount returned to cover the defendant's administrative costs. Mr. Sogg brought suit in August 2004.

{¶ 3} Mr. Sogg was certified under Civ.R. 23(B)(2) as a class representative for all those who have recovered unclaimed funds since August 4, 2000, and who were not paid interest on their funds after July 1991. The class certification order was filed February 24, 2006. In a separate decision, the court determined that a four-year statute of limitations is applicable under Ohio law and under Section 1983, Title 42, U.S.Code to the "takings" claims made in this case. Thus, claims by those whose unclaimed funds had been repaid prior to August 4, 2000 (although without interest attributable to the period after July 26, 1991) were time-barred. Their legal injury manifested itself more than four years before this suit began.

{¶ 4} Doug White is Director of the Ohio Department of Commerce. He supervises the Division of Unclaimed Funds within the Ohio Department of Commerce. The division operates an elaborate program to gather funds, keep track of them, and advertise publicly to alert owners that their property is in state custody. According to the recent news release referenced at footnote one, outreach efforts include kiosks at the Ohio State Fair that connect directly to the division's "Online Treasure Hunt" website. Using those computer terminals, the public can determine whether their names are associated with any of the 3.2 million open accounts still waiting to be claimed.

{¶ 5} R.C. 169 sets forth the procedure under which unclaimed funds are collected and distributed by the division. Ohio first adopted the Unclaimed Funds Act in 1967. From fiscal year 1968 through fiscal year 2005, the state controlled almost $1.3 billion as unclaimed property. Over the entire period, the program successfully returned 35 percent of the property to its owners.

{¶ 6} For the first several decades, this program paid interest to owners upon the return of their money. However, a July 1991 amendment to R.C. 169.08(D) eliminated payment of all interest. The statute now explicitly provides, "Interest is not payable to claimants of unclaimed funds held by the state." R.C. 169.08(D). Furthermore, as discussed below, since 1991, the defendant has been statutorily authorized to, and actually does, collect a five-percent administrative charge measured against funds returned to successful claimants.

{¶ 7} The purpose of the Ohio Unclaimed Funds Act is threefold: (1) to protect the property right of the owner and reunite the owner with his or her funds, (2) to provide a centralized contact for potential unclaimed-funds owners, and (3) to relieve holders of unclaimed funds from further legal liability.

{¶ 8} Under Ohio law, money, rights to money, and intangible property are classified as "unclaimed" when the owner has not generated activity for a prescribed period—generally five years, depending upon the type of property—

and when the nonowner "holder" of such property cannot locate the owner. All funds that meet the statutory definition of "unclaimed" are placed under the division's control. "Holders" of unclaimed funds may, in the division's discretion, remit ten percent and retain 90 percent of the unclaimed funds. In instances such as these, R.C. 169.05 requires the holder to invest the retained amount into an approved FDIC-insured "income-bearing" account or a U.S. Treasury account. The holder is then required to deliver all earnings realized on such invested funds to the division.

{¶ 9} Marketable securities and other intangible, nonmonetary property delivered into the defendant's custody are sold and converted into cash in accordance with R.C. 169.05(A). Further, while the act does not specifically address tangible items, the division also accepts custody of property left behind in safe-deposit boxes, such as stamp and coin collections. The division inventories the items and establishes accounts for the owners. Tangible items are kept intact until such time as the division elects to liquidate them at auction. The last such auction was held in 1998. Once the items are liquidated, the division treats the proceeds like all other unclaimed funds.

{¶ 10} The division holds unclaimed funds in trust for the owner in perpetuity. Funds and other property never escheat or otherwise become property of the state of Ohio. Concepts of "abandonment" or "escheat" are not a part of the Ohio statutory scheme.

{¶ 11} Funds held by the division are not permitted to sit idle. Many of the funds are actually invested by the state (or by another holder) to accrue interest or other earnings that are eventually paid to the state. Interest-bearing accounts contain the principal funds that are held by the defendant, including the ten-percent funds not retained by holders outside state government and the interest paid in to the state that is earned on the 90 percent of funds that the state may elect to leave in private hands. Beyond those income-bearing accounts, a substantial amount of unclaimed money is transferred to finance state programs such as the Ohio Housing Finance Authority ("OHFA"), which obtained $570 million from the pool of unclaimed funds between state fiscal years 1991 and 2005. Those funds were then lent to the public at interest to support housing development in the state. Money so utilized remains subject to recall to repay claims of owners. However, even if the OHFA remits the principal to the division, it never remits any interest received from home loans that the OHFA has made using the unclaimed funds.

{¶ 12} The defendant accounts for operation of the division using three major expense categories: operating expenses, administrative and computer support, and holder mailing and other expenses. Operating expenses include payroll, external auditors, advertising, and equipment. Between fiscal years 1992 and

2005, the division showed expenses of $74.5 million, exclusive of amounts transferred to Ohio's General Revenue Fund. Transfers to the General Revenue Fund of the state are accounted for, within the division, as monetary losses. Between fiscal years 1992 and 2005, as the offset to expenses, unclaimed property held by the division earned $73 million. This figure is, however, exclusive of earnings constructively realized on the hundreds of millions of dollars transferred to the OHFA and to other state programs as well. Using its own peculiar form of bookkeeping, the division asserts that it has operated at a net loss of $1,466,789 since fiscal 1992.

{¶ 13} Insofar as earnings on unclaimed funds are concerned, the division's accounting is materially inconsistent with generally accepted accounting principles ("GAAP") or any other sensible accounting standards. The system used artificially ignores earnings realized from funds transferred to the OHFA simply because, somewhere along the way, someone in authority decided that the OHFA need not account for or pay over the interest it earns on home loans made using unclaimed funds. As of June 30, 2005, the OHFA had returned $316 million to the division. Interest earnings should be imputed to that $316 million, and for many of those years, the statutory interest rate in Ohio was ten percent. Beyond the OHFA, unclaimed funds have also been transferred to the Savings and Loan Assurance Corporation, the Ohio Job Development Fund, and the state General Fund. However, unclaimed funds transferred to destinations other than the OHFA never are returned to the defendant and, not surprisingly, no interest earnings ever are remitted or credited to the division. Furthermore, additional unclaimed funds are held by the state treasurer at interest to be used to pay approved claims and operating expenses. Since June 2005, no such interest from the treasurer's account is either remitted or credited to the division.

{¶ 14} Between July 1, 2000, and June 30, 2005, just the unclaimed funds retained within the division earned $29,074,394. Above and beyond that, the $9,002,403 was realized as proceeds of the five-percent claim-processing fee. Expenses claimed by the defendant for fiscal years 2004 and 2005 are aberrational.[3] Leaving those years aside, total operating expenses averaged approximately

---

3. Expenses claimed for 2004 and 2005 skyrocketed because of extraordinary costs attributed to outside auditors. They were paid on a contingent-fee basis to investigate potential holders of unclaimed funds outside Ohio, leading to recovery of additional unclaimed funds due the state. It distorts the concept of "operating expenses" for the division to lump these unusual contingency fees into the mix as ordinary expenses without offsetting them with the resultant "income" received. The amount of newly discovered unclaimed funds plus the interest earnings on them generated by outside auditors is no doubt far more than the contingency fees paid—the very definition of a contingency fee assures that! Without including extraordinary contingent fees in operating costs, the expense to operate the division appears relatively stable, adjusted for inflation, going all the way back to 1992. For this reason, the court attaches no significance to the nearly three-fold increase in "expenses" claimed for 2004 and 2005.

$5.6 million. Interest on just the unclaimed funds retained within the division plus the five-percent fee generated $7.6 million per year.

{¶ 15} Notwithstanding difficulties attributable to state accounting practices that systematically underreport earnings attributable to unclaimed funds (thereby obscuring the true cost of the OHFA and other public programs using such funds interest-free), the division does not operate even close to a financial loss. If GAAP accounting were employed, accurate figures would be readily available. Yet for the purpose of this opinion, the evidence supports a finding beyond a reasonable doubt that the Ohio unclaimed-funds program makes substantial profit for the state. Indeed, it is a veritable cash cow feeding an array of other public programs.

### Private Property in Unclaimed Funds

{¶ 16} In a takings case under either the state or federal Constitution, the first question is whether private property is implicated. In this case, it is undisputed that unclaimed funds held by Ohio always remain the property of the private owner.

{¶ 17} That being true, the issue becomes whether interest earned on those funds while in the control of state government is also the property of the private owner. The basic rule that "interest follows principal" offers at least a partial answer to this question. That rule is of long standing but retains current vitality. The Supreme Court of the United States recently recognized that the rule that " 'interest follows principal' has been established under English common law since at least the mid–1700's." *Phillips v. Washington Legal Found.* (1998), 524 U.S. 156, 165, 118 S.Ct. 1925, 141 L.Ed.2d 174. Furthermore, "this rule has become firmly embedded in the common law of the various States." Id. and fn. 5. Ohio is among those states. The defendant concedes that "Ohio generally recognizes the common law doctrine of 'interest follows principal.' " Ohio has long recognized this rule. See, e.g., *City of Ohio v. Cleveland & Toledo RR. Co.* (1856), 6 Ohio St. 489, 494–495. The tenet that interest follows principal remains in place today. *Thompson v. Indus. Comm.* (1982), 1 Ohio St.3d 244, 249, 1 OBR 265, 438 N.E.2d 1167; *Akron v. Kalavity* (Feb. 2, 2000), Summit App. No 19678, 2000 WL 141048 (in eminent domain case, interest earned while funds deposited less customary clerk's fees belonged to the landowners). More generally, the rule that interest should be paid on principal sums due is recognized in Ohio statutes. E.g., R.C. 1343.03 (assessing pre- and postjudgment interest on legal claims).

{¶ 18} As a corollary to "interest follows principal," it is said, generally speaking, that interest generated from private funds belongs to the owner of the principal even when the money is held in an account mandated by the govern-

ment. *Phillips,* 524 U.S. at 172, 118 S.Ct. 1925, 141 L.Ed.2d 174; *Kalavity,* supra. The question then becomes whether the Unclaimed Funds Act in Ohio mandates a different rule of property law.

{¶ 19} The 1991 amendment to R.C. 169.08(D) provided that "[i]nterest is not payable to claimants of unclaimed funds held by the state." Plainly, this statute is limited in scope. It did not purport to repeal the common-law recognition that "interest follows principal." Of course, the Ohio Supreme Court has recognized that the General Assembly may sometimes abrogate common-law principles through legislation. *Thompson,* 1 Ohio St.3d at 249, 1 OBR 265, 438 N.E.2d 1167, citing *Eshelby v. Cincinnati Bd. of Edn.* (1902), 66 Ohio St. 71, 74, 63 N.E. 586. But as the defendant concedes, *Thompson* "does not mean that the General Assembly may legislate away existing property rights." The Constitution places limits on how a state may tinker with established rights of private property.

{¶ 20} "The Takings Clause protects private property; it does not create it. * * * Even though fundamental principles of State property law may define property rights, the Takings Clause nevertheless limits a State's authority to redefine preexisting property rights. Thus, 'a State, by *ipse dixit,* may not transform private property into public property without compensation' * * * nor can it 'sidestep the Takings Clause by disavowing traditional property interests long recognized under state law.'" *Washlefske v. Winston* (C.A.4, 2000), 234 F.3d 179, 183–84, quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith* (1980), 449 U.S. 155, 164, 101 S.Ct. 446, 66 L.Ed.2d 358, and *Phillips,* 524 U.S. at 167, 118 S.Ct. 1925, 141 L.Ed.2d 174. "The States' power vis-a-vis property thus operates as a one-way ratchet of sorts: States may, under certain circumstances, confer 'new property' status on interests located outside the core of constitutionally protected property, but they *may not* encroach upon traditional 'old property' interests found within the core. *See* Richard H. Fallon Jr., *Some Confusions About Due Process, Judicial Review, and Constitutional Remedies,* 93 Colum.L.Rev. 309, 329 (1993). Were the rule otherwise, States could unilaterally dictate the content of—indeed, altogether opt out of—both the Takings Clause and the Due Process Clause simply by statutorily recharacterizing traditional property-law concepts." (Emphasis sic.) *Schneider v. California Dept. of Corr.* (C.A.9, 1998), 151 F.3d 1194, 1200–1201 subsequent opinion at 345 F.3d 716 (2003). *McIntyre v. Bayer* (C.A.9, 2003), 339 F.3d 1097, followed *Schneider* and observed that " 'constitutionally protected property rights can—and often do—exist *despite* statutes * * * that appear to deny their existence.' " (Ellipses sic.) Id. at 1100, fn. 5.

{¶ 21} Consistent with the logic of these decisions, the court cannot readily accept the state's argument that the General Assembly retained broad authority in 1991 to redefine interest on unclaimed funds as something other than private

property. In considering this question, it is noteworthy that the 1991 amendment to R.C. 169.08 both altered a longtime rule of common law *and* completely reversed the prior version of the same statute that *had* mandated payment of interest on unclaimed funds held by the state. R.C. 169.08(D) provided in 1967 that an owner of funds whose claim was allowed by the Director *would* receive interest "computed at the rate earned by such funds during the period the director of commerce held the funds or at the rate agreed to by the holder and the owner, whichever is higher." Thereafter, a provision setting interest at the fixed rate of six percent was added to R.C. 169.08(D). That provision continued through several statutory amendments. See, e.g., Sub.H.B. No. 201, 141 Ohio Laws 2005 (1985). Finally, in the 1991 biennial state budget bill (Am.Sub.H.B. No. 298, 144 Ohio Laws 4038), the right to any interest was abruptly eliminated. Not only was the "interest is not payable" language added, which is the primary focus of this suit, but also a five-percent "fee for administering the funds" was introduced for the first time, to be assessed against any funds repaid to an owner. Uncodified Sections 151 and 194 of that 1991 budget bill make it abundantly clear that those enactments occurred during a period of great revenue uncertainty for the state of Ohio, although standing alone, this historical fact is of no more constitutional importance than the presumed social benefit derived from subsidizing housing loans.

{¶ 22} For these reasons, the court holds that the common-law rule of property law that "interest follows principal" was not subject to legislative repeal in 1991 as it pertains to the unclaimed-funds statutes. Accordingly, because private property is implicated, the court turns to the federal and state takings claims made on behalf of the plaintiff class.

### Takings Actionable under the United States Constitution

{¶ 23} Counts IV and V of the amended complaint set out federal "takings" claims. Count V specifically relies upon Section 1983, Title 42, U.S.Code, the federal civil-rights statute providing a remedy for constitutional violations occurring under color of state law. The Takings Clause of the Fifth Amendment has been applicable to the states, through the Fourteenth Amendment, since *Chicago, Burlington & Quincy RR. Co. v. Chicago* (1897), 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979. *Kelo v. New London* (2005), 545 U.S. 469, 125 S.Ct. 2655, 2658, 162 L.Ed.2d 439, fn. 1.

{¶ 24} "The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.' U.S. Const. Amend. V. This restraint on the power of the government to take private property * * * is 'designed to bar [the government] from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by

the public as a whole.' *Penn Central Transp. Co. v. City of New York* (1978), 438 U.S. 104, 123 [98 S.Ct. 2646, 57 L.Ed.2d 631] (1978)." *Prater v. Burnside* (C.A.6, 2002), 289 F.3d 417, 424.

{¶ 25} The United States Supreme Court has consistently recognized that the act of separating interest from the principal that earned it, when done by a state or political subdivision, may constitute a taking of property for constitutional purposes. *Brown v. Legal Found. of Washington* (2003), 538 U.S. 216, 235, 123 S.Ct. 1406, 155 L.Ed.2d 376; *Phillips*, 524 U.S. at 168, 118 S.Ct. 1925, 141 L.Ed.2d 174; *Webb's*, 449 U.S. at 164–65, 101 S.Ct. 446, 66 L.Ed.2d 358. Moreover, *Brown* clarified that the straightforward application of per se legal rules is the appropriate method of analysis in a case like this one, in which interest is taken by the government. *Brown*, 538 U.S. at 233–235, 123 S.Ct. 1406, 155 L.Ed.2d 376. This case is not one in which the alternative legal analysis in takings cases, requiring "complex factual assessments of the purposes and economic effects of government actions," such as is used to evaluate the constitutionality of zoning or other government regulatory action, is appropriate. Id. at 234, 123 S.Ct. 1406, 155 L.Ed.2d 376; see, also, *Schneider*, 345 F.3d at 720.

{¶ 26} The defendant concedes that interest generally follows principal, but postulates several reasons why that common-law rule is inapplicable to funds held in trust by the division. First, it is argued that the plaintiffs have no right to interest on the unclaimed funds because the General Assembly abrogated the common-law rule that interest follows principal as it pertains to unclaimed funds when it amended R.C. 169.08(D) on July 26, 1991. That argument has been rejected above. Second, the director argues that since unclaimed funds are essentially "abandoned," the owners of those funds no longer enjoy any right to their funds, much less to interest accrued thereon. Third, the defendant claims that plaintiffs are not entitled to compensation because they suffered no pecuniary loss, in that without the unclaimed-funds program, all interest would be lost on these funds. Fourth, the state contends that it is not liable because the amount that the division retains from the interest on unclaimed funds does not meet the division's administrative costs. That argument fails based upon the factual record, as already discussed. The remaining arguments will be separately examined.

## Unclaimed Property in Ohio Is Not "Abandoned"

{¶ 27} The defendant argues that common-law principles of escheat or abandonment apply and supplies ample legal authority to seize unclaimed funds in their entirety. Hence, it is said, that same sovereign power necessarily includes the lesser power to retain just the interest generated by unclaimed funds. The defendant suggests that the legislature's definition of "unclaimed

funds" is tantamount to a definition of abandoned property subject to escheat. From this, he reasons, all the old common-law legal rules applicable to owners who truly abandon property are determinative here.

■■ {¶ 28} It is well established at common law that sovereign states have the power to take custody of or assume title to abandoned personal property as bona vacantia, through a process commonly called escheat. *Delaware v. New York* (1993), 507 U.S. 490, 497, 113 S.Ct. 1550, 123 L.Ed.2d 211; see, also, *Smyth v. Carter* (Ind.App. 2006), 845 N.E.2d 219, 222 (addressing a takings claim under Indiana's unclaimed funds program). When considering a state's power of escheat, one must look to the law that creates the property right and binds others to honor it. *Delaware v. New York*, 507 U.S. at 501, 113 S.Ct. 1550, 123 L.Ed.2d 211.

{¶ 29} The unclaimed-funds statutes, rather than the general common law of abandonment or escheat, must be consulted to determine whether the defendant may assert abandonment with respect to unclaimed funds. The Ohio statutes so comprehensively regulate the defendant's operation of the program that it cannot be thought that the legislature left such an important matter outside the Code. Thus, notwithstanding the defendant's attempt to straddle the proverbial line by stating in ¶ 12 of his Amended Answer that the Ohio unclaimed-funds law "is not strictly an escheat statute," one must turn to the statutes to determine whether "escheat" or any related doctrine genuinely applies.

{¶ 30} The notion of an "escheat" based upon an "abandonment" of private property runs contrary to the language of the Unclaimed Funds Act, as well as division operations under the act for nearly forty years. The Unclaimed Funds Act does not define unclaimed funds as "abandoned" property at all. R.C. 169.01(B) and 169.02 define the term "unclaimed funds." Neither refers to funds for which Ohio asserts jurisdiction as "abandoned" property. On the other hand, in referring to unclaimed-funds programs operated in other states, the Ohio law specifically recognizes the concepts of escheat and abandonment. Funds will not be considered unclaimed funds under Ohio law "if they may be claimed as unclaimed, abandoned, or escheated funds under the laws of such other state." R.C. 169.04(A). This wording plainly shows that the drafters recognized a distinction between "unclaimed," "abandoned," and "escheated" funds. The absence of the words "abandoned" and "escheated" elsewhere in the Act cannot be attributed to mere inadvertence. Therefore, the statutory language actually written does not support the defendant's argument that this is merely a disguised form of an "abandoned" property program.

{¶ 31} Viewing the unclaimed-funds statutes as, in substance, addressed to funds subjected to a form of "forfeiture" to the government would also be contrary to the stated purposes of the act, which are (1) to protect the property

right of the owner and reunite the owner with the funds, (2) to provide a centralized location of contact for potential unclaimed-funds owners, and (3) to relieve holders of unclaimed funds turned over to the state from further legal liability for the property. The defendant's argument that funds administered by the defendant are not truly private property also contradicts public statements by the defendant in operating this program. Nowhere is it said that unclaimed funds have been forfeited or are no longer private property, much less is it suggested that title to a part of the funds has become vested in state government. Nothing, even by implication, would lead a reasonable observer to conclude that unclaimed funds ever escheat to Ohio. The "Frequently Asked Questions" and answers posted on the defendant's official website prove beyond a reasonable doubt that this is not a forfeiture program or one grounded in the concept of escheat.

{¶ 32} Pragmatic reasons also support the conclusion that the General Assembly did not enact a forfeiture statute. Passage of legislation that would work a forfeiture of millions of dollars each year, and under which ill, elderly, careless, or forgetful Ohio citizens would simply lose their property to the state forever would be of broad public concern. There is no evidence before the court suggesting that any such apprehension arose from the 1991 amendment to the unclaimed funds statute. It is far more sensible to read the entire body of related unclaimed funds statutes as they were written and consistently administered since Ohio's program began in the 1960s: funds remain private property forever while in state hands. Property is never treated as abandoned or forfeited. R.C. 169.08(D) cannot be understood to passively cause that result.

{¶ 33} The defendant relies upon the Indiana appellate decision announced earlier this year in *Smyth*, 845 N.E.2d 219. That court held that although the common-law maxim "interest follows principal" is recognized in Indiana, the maxim did "not apply where an owner's actions cause the loss of rights of ownership." Id. at 223. Under Indiana's version of the unclaimed-funds law, such property is "presumed abandoned." Id. at 222, quoting portions of the Indiana Code. This, in turn, indicated to that court that "an owner's failure to exercise his or her right of possession results in a presumption that the property has been abandoned" so that the state has plenary power over it, including the right to retain interest earnings. Id. at 223. The Ohio act operates differently. Nothing in Ohio law "presumes" abandonment of title. Accordingly, *Smyth* is not relevant to the takings claims addressed to R.C. 169.08(D).

{¶ 34} Certainly one could argue that Ohio *might* have legislated differently. Perhaps, like Indiana, Ohio could provide that no owner could recover his property once it fell into state hands. Yet to acknowledge that legislative authority may exist to create a system of property rights in which unclaimed funds are treated as abandoned, with title to escheat to the state, does not mean

that the different system actually created in Ohio works the same way, the 1991 amendment to R.C. 169.08(D) notwithstanding. For present purposes, this court must concentrate on what was adopted by the General Assembly. "[J]ust compensation is not to be measured by what would have happened in a hypothetical world." *Brown*, 538 U.S. at 245, 123 S.Ct. 1406, 155 L.Ed.2d 376 (Scalia, J., Rehnquist, C.J., Kennedy, and Thomas, JJ., dissenting).

### Do Plaintiffs Suffer a Property Loss for Constitutional Purposes?

{¶ 35} The defendant next argues that but for the Unclaimed Funds Act, interest could never accrue on unclaimed funds, so that although a taking of property may occur, there is no compensation due. In *Brown*, 538 U.S. 216, 123 S.Ct. 1406, 155 L.Ed.2d 376, and *Phillips*, 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174, the United States Supreme Court grappled with the appropriate constitutional analysis to apply when government takes property, generates interest earnings with it, but then retains those earnings. Both decisions were decided by five-to-four votes. Both addressed Interest on Lawyers Trust Account ("IOLTA") systems adopted across the nation. The factual premise for IOLTA is simple yet essential to an understanding of the ultimate outcome in these two recent decisions. All lawyers in private practice have, from time to time, client funds in their possession. Under longstanding practice, lawyers are expected to maintain clients' money separate from their own. Beyond this, statutory mandates in R.C. 4705 and in rules for the bar, including Disciplinary Rule 9–102(E)(1), require use of IOLTA accounts. Such accounts pool insubstantial sums of client money until the funds are disbursed, or hold larger amounts of money for insubstantial periods of time. In either event, the premise is that absent pooling with similar funds belonging to clients of other lawyers, there would be no interest earnings that could ever be meaningful and that would exceed the expense of opening separate bank trust accounts (with related record keeping) for each specific client having even a small amount of money. Interest earned on pooled IOLTA funds is then siphoned off. In Ohio, those earnings directly support the Ohio Legal Assistance Foundation. It, in turn, financially supports the Legal Aid Society of Columbus and comparable organizations serving low-income residents across the state. Given these facts, the Supreme Court of the United States concluded in 2003 in *Brown*, that while a "taking" of property (the interest) occurs with IOLTA accounts, there is no net loss to the property owner. This is because, by definition, funds in IOLTA accounts would never have earned any interest without the pooling arrangement mandated by these programs. A "taking" requires not only that property be devoted to "public use"[4] but also that "just compensation" be due the owner. Under the

---

4. No one questions the "public use" element of this unclaimed funds case that clearly is equivalent to the public use of IOLTA fund interest recognized in *Brown*, 538 U.S. at 232, 123 S.Ct. 1406, 155 L.Ed.2d 376.

facts in *Brown*, there simply was no pecuniary loss to the owner triggering any right to just compensation. The Supreme Court reaffirmed Justice Holmes' observation that "the question is what has the owner lost, not what has the taker gained." *Brown*, 538 U.S. at 236, 123 S.Ct. 1406, 155 L.Ed.2d 376, quoting *Boston Chamber of Commerce v. Boston* (1910), 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725.

{¶ 36} Absent a pecuniary loss, there is no violation of the Takings Clause. *Brown*, 538 U.S. at 235, 123 S.Ct. 1406, 155 L.Ed.2d 376. However, that holding from *Brown* does not assist the defendant. Here, the record shows that unlike the facts before the Supreme Court in the IOLTA litigation, unclaimed funds managed by the defendant are not trifling in amount. The average amount of money returned to successful claimants since fiscal year 1992 (when the statute eliminated payment of interest) has been $1,010. Furthermore, Ohio's Act affords particularized attention to unclaimed accounts worth $50 dollars or more, an amount of money that, despite inflation, remains meaningful to the legislature and that is capable of generating some interest if held for any duration. See R.C. 169.03(A)(2) and (D). As was true with the property of Julia Sogg, furthermore, unclaimed funds appear to remain under the division's control for substantial periods of time. Since fiscal year 1992, over $1 billion in unclaimed funds have been reported to or deposited with the division, but over that recent period, only $381 million (or 36 percent) have been paid out. Viewed more broadly, beyond a reasonable doubt, the unclaimed funds program generates millions of dollars in net interest each year that is simply expropriated by the state. Restitution is therefore due the class of property owners represented by Mr. Sogg based upon the value of interest earned on each individual account retained by the division. See *Brown*, 538 U.S. at 239, 123 S.Ct. 1406, 155 L.Ed.2d 376, fn. 10.

{¶ 37} *Brown* and *Leider v. United States* (C.A.Fed., 2002), 301 F.3d 1290 are argued for the proposition that Ohio has no duty to either hold unclaimed funds for owners or to create an arrangement under which funds accrue interest. *Brown* has already been discussed at length. The facts in *Leider* were that a creditor was owed a distributive share of a bankruptcy settlement. When the bankruptcy court was unable to locate him, it deposited the money in the United States Treasury as unclaimed funds, which earned no interest. When Leider finally received his payout, he sued for interest, relying on the Takings Clause of the Fifth Amendment and the "interest follows principal" rule. In rejecting that claim, the Federal Circuit recognized that since Leider's funds never were invested by the government, no interest could follow the principal. *Leider*, 301 F.3d at 1296. *Leider* also relied upon an earlier decision in *U.S. Shoe Corp. v. United States* (C.A.Fed., 2002), 296 F.3d 1378, 1384, holding "that 'for the accrued interest to rise to the level of private property, the principal must be held in an

identified private account.' " *Leider*, 301 F.3d at 1297, fn. 5, quoting *U.S. Shoe*, 296 F.3d at 1384.

{¶ 38} In contrast, Ohio explicitly provides that unclaimed funds will be maintained in identifiable private accounts. R.C. 169.03(A)(2). Ohio law plainly recognizes that interest will be earned on unclaimed funds while in the defendant's possession. For instance, R.C. 169.05(A) provides that upon the actual transfer of the funds to the state, the director may either forward the funds over to the state Treasury or place them in a financial institution, whereupon "[a]ny interest earned on money * * * shall be credited to the [unclaimed funds] trust fund." Furthermore, unclaimed funds are always intended to be returned to their rightful owners. Thus, *Leider* was based upon factual circumstances unlike those presented here (and in *Webb's*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358) and is not relevant in deciding this case.

### The Effect of the Five–Percent Fee

{¶ 39} The defendant's arguments also overlook the constitutional significance of the five-percent administrative fee that the defendant collects. R.C. 169.08(D) provides, "The director shall retain * * * as a fee for administering the funds, five per cent of the total amount of unclaimed funds payable to the claimant." Between fiscal years 1992 and 2005, this fee yielded $15,621,288.

{¶ 40} *Webb's*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358, was a unanimous decision of the Supreme Court announced in 1980. It addressed money interpleaded into a court, pending the outcome of a lawsuit. Florida took an administrative fee and also kept the interest earned on the funds. Recognizing that there was a property right in the interest earnings and the rule that interest follows the principal, the Supreme Court held that "where there is a separate and distinct state statute authorizing a * * * fee 'for services rendered' based upon the amount of principal deposited; where the deposited fund itself concededly is private; and where the deposit in the * * * [government's control] is required by state statute," the retention of interest earned over and above the fee was "a taking violative of the Fifth and Fourteenth Amendments." *Webb's*, 449 U.S. at 164–65, 101 S.Ct. 446, 66 L.Ed.2d 358. The Court in *Webb's* expressed no view on the constitutionality of a statute under which retention of interest earned would be the only return to the government, but as noted already, this case is exactly like *Webb's* in that both a five-percent administrative fee and retention of interest earnings occur.

{¶ 41} Consistent with *Webb's*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358, it is unconstitutional for the defendant to retain interest on unclaimed funds when the Unclaimed Funds Act already provides a specific five-percent administrative fee for the services given to owners of unclaimed funds. While *Webb's* left

open a decision on whether interest could be retained in the absence of an administrative fee or if the government program was operating at a loss, those questions are not pertinent here. The claimed poverty of the division reflects nothing more than creative bookkeeping. The General Assembly's decision to use the division's coffers like a piggybank runs afoul of *Webb's*: "[T]he exaction is a forced contribution to general governmental revenues, and it is not reasonably related to the costs of using * * * [the Division of Unclaimed Funds]. Indeed, 'the Fifth Amendment's guarantee was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Id. at 163, 101 S.Ct. 446, 66 L.Ed.2d 358, quoting *Armstrong v. United States* (1960), 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554.

{¶ 42} Accordingly, the court finds and declares that the nonpayment of interest on unclaimed funds and the further enforcement of the first sentence of R.C. 169.08(D), as amended in July 1991, violate the Fifth Amendment of the United States Constitution. The plaintiff class is entitled to a remedy under Section 1983, Title 42, U.S.Code.

## Takings Analysis under the Ohio Constitution

{¶ 43} Counts I and III of the amended complaint seek relief premised upon a violation of the "takings" clause in the Ohio Constitution. Section 19, Article 1 of the Ohio Constitution provides, "Private property shall ever be held inviolate, but subservient to the public welfare." In approaching one recent takings case under this Ohio provision, Chief Justice Moyer began "by reaffirming the premise that the law does not favor forfeiture." *State ex rel. Pizza v. Rezcallah* (1998), 84 Ohio St.3d 116, 131, 702 N.E.2d 81. R.C. 169.08(D) demands, in a very real sense, a forfeiture of interest earnings to the state.

{¶ 44} As the *Pizza* decision recognized, the Takings Clause of the Ohio Constitution provides an independent basis for deciding such a case, although the legal analysis used tracks closely that given a takings claim under the United States Constitution.[5] See, also, *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 43. "Ohio has always considered the right of property to be a fundamental right. There can be no doubt that the bundle of venerable rights associated with property is strongly protected in the Ohio Constitution and must be trod upon lightly, no matter how great the weight of other forces." (Citations omitted.) Id. at ¶ 38. The Sixth Circuit recently

---

5. Equal protection and due process are other Ohio and federal constitutional provisions viewed as "nearly identical" in their application. *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 424, 633 N.E.2d 504; *Warren v. Athens* (C.A.6, 2005), 411 F.3d 697, 704, n. 6.

observed that decisions granting relief from takings have become almost routine in the state courts of Ohio in the last decade. *Coles v. Granville* (C.A.6, 2006), 448 F.3d 853, 863–864. This, too, speaks to the viability of Article 1, Section 19 of the state Constitution.

{¶ 45} The analysis of the factual record under the Fifth Amendment applies with full force under the Ohio Constitution. The plaintiff and the class he represents are entitled to restitution. See, e.g., *Santos v. Ohio Bur. of Workers' Comp.*, 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441, syllabus.

### Conclusion

{¶ 46} Constitutions exist in America to arrest the devolution of power over certain key features of life. They assure that the will of majorities expressed in laws enacted by the legislative branches of the state and national governments always remain within predetermined boundaries. One important boundary surrounds private property. Ohio's legislature crossed that boundary in 1991 when it amended the first sentence of R.C. 169.08(D) and coupled retention of interest earnings with imposition of the five-percent administrative fee against all unclaimed funds returned to their rightful owners.

{¶ 47} Pursuant to Civ.R. 57, the court grants a declaratory judgment consistent with this opinion. Furthermore the court holds that under Ohio law, the first sentence of R.C. 169.08(D) shall be deemed severed from the balance of the statute. See *Norwood*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, at ¶ 126–127.

{¶ 48} To enforce the declaratory relief granted to the plaintiff class, the court grants the additional relief of an injunction barring the defendant and all those acting in concert with him from further enforcement of the first sentence of R.C. 169.08(D).

{¶ 49} Recognizing that this opinion resolves substantial claims by the plaintiff class but may give rise to questions of fiscal management for the defendant's operations and other programs operated by state government using unclaimed funds, the court grants a stay of the effectiveness of this declaratory judgment and injunctive relief pending appeal, pursuant to Civ. R. 62(C) and (E). The stay is conditioned upon the defendant and all those under his control within the Division of Unclaimed Funds continuing to maintain careful records of all persons who are or become successful claimants during the pendency of appeals, and remaining in compliance with Class Action Management Order # 1 filed February 24, 2006, to assure that if the judgment is ultimately affirmed, all class members entitled to relief can readily be located and provided all relief to which they are entitled.

{¶ 50} In the judgment being entered simultaneously with this opinion, the court certifies this case for immediate appeal, consistent with prior discussions with the parties, finding pursuant to Civ.R. 54(B) that there is no just reason for delay in entering the declaratory judgment and injunction because they determine the liability issues in this case. The court further finds that immediate interlocutory review of the judgment is in the interests of all parties and of the public. If these portions of the case are affirmed, the parties have stipulated that restitution or other equitable relief will be appropriate. Determining the amount of restitution due individual class members, a method of contacting them and distributing interest owed, consideration of an award of a reasonable attorney fee to the plaintiffs' counsel either on a common-fund basis or pursuant to the Civil Rights Attorney Fees Act, Section 1988, Title 42, U.S.Code, are steps appropriately postponed until the core issues of legal liability discussed above are finally determined on appeal.

So ordered.